IN THE SUPREME COURT OF THE STATE OF ARIZONA


JEFFREY L. ANDREWS,                    )    Arizona Supreme Court
                                       )    No. CV-02-0233-PR
    Plaintiff/Counterdefendant/        )
                    Appellant,         )    Court of Appeals
                                       )    Division One
                    v.                 )    No. 1 CA-CV 01-0363
                                       )
LESLIE W. BLAKE and MOON               )    Maricopa County
VALLEY NURSERY, INC., an               )    Superior Court
Arizona corporation,                   )    No. CV 99-20140
                                       )
    Defendants/Counterclaimants/       )    **O P I N I O N**
                    Appellees.         )
                                       )


Appeal from the Superior Court of Maricopa County
The Honorable Barry C. Schneider, Judge
The Honorable Roland J. Steinle III, Judge

**REVERSED AND REMANDED**

---

Memorandum Decision of the Court of Appeals
Division One
Filed April 5, 2002
**VACATED**

---

Law Office of Curtis D. Drew                         Scottsdale
     by Curtis D. Drew
     and
Ulrich & Anger, P.C.                                 Phoenix
     by Paul G. Ulrich
Attorneys for Plaintiff/Counterdefendant/Appellant

Mariscal, Weeks, McIntyre & Friedlander, P.A.        Phoenix
     by Timothy J. Thomason
     and
Law Offices of Neil Vincent Wake                     Phoenix
     by Neil Vincent Wake
     and
Quarles & Brady Streich Lang LLP                     Phoenix
     by Michael E. Korenbalt
Attorneys for Defendants/Counterclaimants/Appellees

---

P E L A N D E R, Judge.

¶1     Defendants Leslie Blake and Moon Valley Nursery, Inc., (collectively, Blake) petitioned us to review a decision of the court of appeals that reversed the trial court's summary judgment in favor of Blake and that, instead, directed entry of summary judgment in favor of plaintiff Jeffrey Andrews.  We granted review to examine important questions concerning acceptable methods for a lessee to exercise an option to purchase leased property and the availability of equitable relief to excuse the lessee's failure to timely exercise the option.  *See* Ariz. R. Civ. App. P. 23, 17B A.R.S.  We have jurisdiction pursuant to article VI, § 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.  Finding multiple issues of fact that preclude summary judgment for either party, we vacate the court of appeals' decision, reverse the trial court's judgment, and remand the case for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶2     Andrews owns a 2.33-acre parcel of land in Phoenix that he leased to Blake, who operated a plant and tree nursery on the property through his company, Moon Valley Nursery.  After the parties operated under a one-year lease in 1995, they entered into a three-year lease, prepared by Andrews, in 1996.  Although that lease was to terminate by its terms on January 31, 1999, it also provided an option for Blake to purchase the property for $300,000 "at any time within the calendar year 1999."  In

2

consideration for that option, Blake agreed to pay significantly increased rent during the lease term.

¶3      As of January 1999, both Blake and Andrews were under the mistaken impression that the option as well as the lease would expire at the end of January.  Accordingly, in early February, the parties executed an "Addendum to Lease" that extended the lease term through the end of 1999 and purportedly "extended" the option to purchase the property for the same $300,000 option price until October 1, 1999.  Pursuant to the addendum, Blake paid Andrews $10,000 for that "extension."

¶4      The addendum deleted provisions in the underlying three-year lease relating to notices and Blake's option to purchase, replacing them with new provisions on those topics. The addendum's new "Notices" provision stated that "[a]ll notices . . . required or permitted under this Lease (a 'Notice') shall be deemed given if given in writing and delivered personally, delivered by commercial delivery service, delivered by courier, or mailed by certified mail return receipt requested, postage or delivery charges prepaid, to the party to receive the Notice." That new provision also stated that "[a]ll Notices shall be deemed given when received, as evidenced by the acknowledgment of receipt issued with respect thereto by the entity making the delivery."  The addendum's replacement provision concerning Blake's option to purchase stated that "[t]he option granted hereby shall terminate if not exercised in writing before October 1, 1999."

¶5	The record contains conflicting evidence on when and how Blake first attempted to exercise the option to purchase in the fall of 1999.[1]  In his affidavit, Blake stated he had told Andrews in a telephone call on September 17, 1999, that he was unconditionally exercising the option.  Andrews, however, testified in his deposition that Blake had called him on or about September 17 and had said he wanted "to talk about the property" but had not specifically stated he "wanted to talk about purchasing the property."  In his subsequent affidavit, Andrews acknowledged having had a telephone conversation with Blake sometime in September 1999, in which "Blake said something to the effect that he wanted to get together to talk about buying the Property," but Andrews stated he had told Blake he was too busy to talk and Blake should call again the following week, which he never did.

¶6	In his affidavit, Blake further claimed that, three days later, on September 20, he had "caused a letter to be sent to Andrews, confirming [his] conversation with Andrews on September 17, 1999 exercising the Option to purchase the Property."  According to the affidavits of Blake and Moon

---

[1]In addition to events in late 1999, Blake also stated in his affidavit that he had informed Andrews in December 1998 that he intended to exercise his option to purchase the property during early 1999, but that Andrews had asked him to wait so Andrews could arrange a property exchange for tax purposes.  As noted above, because the parties incorrectly believed that the option to purchase under the existing lease would expire at the end of January 1999, the parties executed the addendum and thereby "extended" the option.

4

Valley's chief financial officer (CFO), the September 20 letter was drafted by the CFO at Blake's instruction and "was sent by ordinary mail." Andrews denies having received any such letter until he received a copy after he commenced this litigation.

¶7        In a letter to Blake dated October 13, Andrews stated Blake had "not compl[ied] with that part of our lease agreement, which required [him] to notify [Andrews], in writing and by certified mail, of [his] intent to exercise the option to purchase the property" before October 1, 1999, and, therefore, Andrews "consider[ed] the option to purchase as expired." According to Moon Valley's CFO, after Blake received that letter on October 18, the CFO had immediately called Andrews, informed him that he already had sent notice of Blake's exercise of the option, and offered to immediately provide a copy of the September 20 letter to Andrews. Andrews testified in deposition that he had spoken by telephone around October 18 with Blake's CFO and that the CFO had stated he previously had sent a letter, but not by certified or registered mail. Andrews further testified that he had told the CFO that he had not received any such letter.

¶8        Blake's counsel also sent a second letter to Andrews dated October 21, purportedly exercising the option again and urging Andrews to "acknowledge, in writing, [his] intent to honor Mr. Blake's valid exercise of the option." Andrews admittedly received that letter around October 23. On December 3, 1999, Blake sent another letter to Andrews, this time by certified

5

mail, return receipt requested, again confirming that Blake was exercising his option to purchase the property. Andrews also admits having received that letter.

¶9 While those events unfolded in the fall of 1999, unbeknownst to Blake, Andrews negotiated a sale of the property to Albertson's grocery stores for approximately $950,000. During those negotiations, Andrews offered to sell the property to Blake in December 1999 for $1,000,000. Blake refused and did not make a counteroffer. According to Blake, Andrews and Albertson's subsequently executed a purchase and sale agreement that was conditioned on the outcome of this litigation.

¶10 In November 1999, Andrews filed this declaratory judgment action seeking a ruling that Blake's option to purchase had expired without being exercised and that Blake therefore had no further interest in the property that would prevent Andrews from selling it to a third party. Blake counterclaimed for specific performance, claiming he had validly exercised the option. On the parties' cross-motions for summary judgment, the trial court granted summary judgment in favor of Blake, invoking equitable principles to excuse Blake's late exercise of the option. Accordingly, the court entered a judgment permitting Blake to purchase the property at the $300,000 option price.

¶11 On Andrews's appeal, the court of appeals reversed and directed entry of summary judgment in his favor. Noting that Arizona law requires strict compliance with options and does not

afford equitable relief to a party such as Blake who negligently failed to timely and properly exercise an option, the court of appeals ruled as a matter of law that "Blake's failure to timely exercise the option was due solely to his own lack of diligence." Accordingly, the court held that Blake's late exercise of the option was not excused on equitable grounds and that, because Andrews denied having received the September 20 letter Blake allegedly had sent by regular mail, Blake could not "ignore his failure to provide the type of notice required in the addendum, which would have established unequivocally that notice had been given."

## DISCUSSION

### I.   Standard of Review

¶12     We review de novo a grant of summary judgment, viewing the evidence and reasonable inferences in the light most favorable to the party opposing the motion. *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, ¶13, 38 P.3d 12, ¶13 (2002). Because interpretation of leases and other contracts involves questions of law, we also review de novo any issues relating thereto. *See Gutmacher v. H & J Constr. Co.*, 101 Ariz. 346, 347, 419 P.2d 525, 526 (1966); *Willamette Crushing Co. v. State ex rel. Dep't of Transp.*, 188 Ariz. 79, 81, 932 P.2d 1350, 1352 (App. 1997). Similarly, the determination of whether equitable relief is available and appropriate is subject to our de novo review. *See*

7

*SDG Macerich Properties, L.P. v. Stanek, Inc.*, 648 N.W.2d 581, 584 (Iowa 2002); *see also Pelletier v. Johnson*, 188 Ariz. 478, 480, 937 P.2d 668, 670 (App. 1996).

¶13     As noted above, the parties filed cross-motions for summary judgment, and both the trial court and court of appeals decided the case as a matter of law based on those motions.  Also as noted above, in determining whether either party is entitled to summary judgment, we must view the facts and reasonable inferences therefrom in the light most favorable to the party opposing the motion.  *See Wells Fargo Bank*, 201 Ariz. 474, ¶13, 38 P.3d 12, ¶13.  "Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law."  *Id.* at ¶14; *see also* Ariz. R. Civ. P. 56(c), 16 A.R.S., Pt. 2; *Orme School v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990).  Thus, summary judgment in favor of either party is appropriate only "if the facts produced in support of the [other party's] claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme School*, 166 Ariz. at 309, 802 P.2d at 1008.

## II.   Interpretation of Addendum

¶14     The parties' February 1999 addendum to the lease contained the following, new provisions relating to notice and the option to purchase:

8

```
NOTICES

    All notices, requests, demands and other
    communications required or permitted under
    this Lease (a "Notice") shall be deemed given
    if given in writing and delivered personally,
    delivered by commercial delivery service,
    delivered by courier, or mailed by certified
    mail return receipt requested, postage or
    delivery charges prepaid, to the  party to
    receive the Notice . . . .

        . . . .

    All Notices shall be deemed given when
    received, as evidenced by the acknowledgment
    of receipt issued with respect thereto by the
    entity making the delivery.

        . . . .

TENANT'S OPTION TO PURCHASE

        Landlord [Andrews] grants to
        Tenant [Blake] the option to
        purchase the Property described in
        Exhibit A hereto at the term [sic]
        of this Lease for the price of
        Three Hundred Thousand Dollars
        ($300,000). . . .  The option
        granted hereby shall terminate if
        not exercised in writing before
        October 1, 1999 . . . .
```

¶15     Blake contends the above provisions did not "purport to set exclusive methods of giving effective notice" of his exercise of the option or "nullify actual notice received by methods other than those listed."  According to Blake, the addendum's notice clause was merely a "safe harbor" provision that did not exclude written notice actually received by other means.  Therefore, he argues, his September 20 letter to Andrews, although sent by ordinary mail, was both timely and effective.

9

¶16      In contrast, Andrews contends the addendum's notice provision set forth the exclusive means of effectively giving notice and neither stated nor implied that it was merely a "safe harbor."  Andrews further asserts that Blake failed to timely and properly exercise the option because he did not send the September 20 letter by one of the means specified in the addendum and, in any event, Andrews did not receive that letter.

¶17      The trial court did not resolve this issue but, rather, resorted to equitable principles to grant relief to Blake, implicitly assuming his exercise of the option was untimely.  The court of appeals, however, concluded "as a matter of law that Blake did not timely and effectively exercise the option to purchase" and that Blake's September 20 letter could not "be treated as effective notice" because Andrews disputed ever having received that notice.  We disagree with the court of appeals' reasoning and conclusion on this point.

¶18      The addendum's notice provision, as Blake correctly argues, did not establish the sole or exclusive means of effectively exercising the option to purchase set forth in the addendum.  The option to purchase provision in the addendum merely stated that the option "shall terminate if not exercised in writing before October 1, 1999."  That provision implicitly required Andrews's actual receipt, before October 1, of Blake's written exercise of the option. *See Korey v. Sheff*, 327 N.E.2d 896, 897 n.5 (Mass. App. Ct. 1975) ("[T]imely notice of intent to

10

exercise an option to renew is effective upon receipt of such notice."); *see also Salminen v. Frankson*, 245 N.W.2d 839, 840 (Minn. 1976) ("notice of the exercise of an option must be received within the option period in order to be effective"; notice of exercise of option mailed by optionee on option's expiration date but received by optionor two days later not effective); Restatement (Second) of Contracts § 63 (1979) (unless the offer provides otherwise, "an acceptance under an option contract is not operative until received by the offeror"). But the option to purchase provision in the addendum neither referred to the addendum's notice provision nor required the "exercise[] in writing" to be accomplished in any particular manner.

¶19     Moreover, the addendum's notice provision did not clearly require all notices or other communications to be delivered by one of the methods specifically prescribed therein. For example, the notice clause did not state that any notices "shall be deemed given *only* if given in writing and delivered" by one of those methods. As the drafter of the addendum, Andrews, had he intended that construction, could and should have stated that any notice had to be sent by one of the listed methods in order to be valid and effective. *See Central Housing Inv. Corp. v. Federal Nat'l Mortgage Ass'n*, 74 Ariz. 308, 311, 248 P.2d 866, 868 (1952) ("[A] contract is to be construed most strongly against the party who prepared it."); *cf. Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, ¶14, 965 P.2d 47, ¶14 (App. 1998).

11

¶20     The language in the addendum's notice provision that notices "shall be deemed given" merely means that notice automatically is effective if given by one of the methods prescribed therein.  But that clause does not necessarily mean that notice is effective if and only if one of those prescribed methods is used.  Construing the notice and option to purchase provisions in the addendum together, and seeking to harmonize those clauses, we conclude that they neither preclude nor automatically render ineffective written exercise of the option to purchase sent by regular mail.  *See*, *e.g.*, *Korey*, 327 N.E.2d at 897 (notice provision in lease that stated "'any such notice to the Lessor shall . . . be deemed duly given if and when mailed by registered mail' . . . [did] not require that written notice be sent by registered mail, to the exclusion of other modes of transmission, in order effectively to exercise the option to renew"); *Osprey L.L.C. v. Kelly-Moore Paint Co.*, 984 P.2d 194, 199 (Okla. 1999) (lease provision stating option notice "may" be delivered personally or by certified or registered mail "does not bar other modes of transmission which are just as effective").

¶21     We find support for our conclusion in *University Realty & Development Co. v. Omid-Gaf, Inc.*, 19 Ariz. App. 488, 508 P.2d 747 (1973), which both parties cite in support of their positions and which the court of appeals distinguished.  The court in *University Realty* held that personal, hand delivery of a written notice exercising an option to renew a lease was

12

effective although the lease called for delivery by registered mail. Even when a lease "requires notice to be made in a particular way," the court ruled, "generally speaking any method of transmission of notice of renewal of a lease may be employed which is effective to bring such notice home to the lessor and serves the same function and purpose as the authorized method." *Id*. at 490, 508 P.2d at 749.

¶22 Andrews contends, and the court of appeals agreed, that *University Realty* is distinguishable and inapplicable here because, unlike Andrews, the lessor there admittedly received the timely notice. But Andrews's denial of having received the letter that Blake and his CFO state "was sent by ordinary mail" on September 20 does not necessarily entitle Andrews to summary judgment. *See Nafstad v. Merchant*, 228 N.W.2d 548, 550 (Minn. 1975) (issue of whether optionor had received optionee's timely letters exercising option to purchase property submitted to jury pursuant to special interrogatory). Rather, triable questions of fact exist on whether Andrews received that letter.[2] If the

---

[2]In his response to Blake's petition for review in this court, Andrews for the first time challenged the sufficiency of Blake's evidence relating to the September 20 letter, contending that the affidavits of Blake and his CFO did not establish that that letter "in fact was mailed" or that the business had an "office routine for handling outgoing mail." Blake counters that the affidavits "plainly mean that under [his] office routine the letter was mailed when signed" and that, in any event, Andrews waived his new argument by failing to challenge Blake's affidavits on evidentiary grounds below. *See A. Uberti & C. v. Leonardo*, 181 Ariz. 565, 568, 892 P.2d 1354, 1357 (1995) (evidentiary objections to affidavits must be made in trial court to preserve issue for appeal). Blake's affidavits, however, do not clearly or conclusively establish that

13

trier of fact finds that Andrews received the September 20 letter before the October 1 deadline, then as a matter of law, Blake timely and adequately exercised the option to purchase.[3]  *See id*. And, in that event, the trial court should direct judgment in favor of Blake based on any such finding.

**¶23**     On the other hand, if the trier of fact determines that Andrews did not receive Blake's September 20 letter, the inquiry does not end there.  Rather, in that event, another issue surfaces:  may Blake be equitably excused from his failure to

his September 20 letter actually was mailed. *See Goodman's Market, Inc. v. Ward*, 4 Ariz. App. 456, 459, 421 P.2d 538, 541 (1966).  In any event, because we conclude that neither party is entitled to summary judgment on the issue of whether that letter constituted a timely, effective exercise of the option to purchase, we do not foreclose further discovery on and litigation of the mailing issue on remand.

[3]Any eventual finding that Blake's September 20 letter, in fact, was properly addressed and mailed with proper postage would give rise to a rebuttable presumption of receipt by the addressee. *See State v. Mays*, 96 Ariz. 366, 367–68, 395 P.2d 719, 721 (1964) ("[T]here is a strong  presumption that a letter properly addressed, stamped and deposited in the United States mail will reach the addressee.").  The presumption is rebutted, however, when the addressee denies receipt, as Andrews did here. *See Government Employees Ins. Co. v. Superior Court*, 27 Ariz. App. 219, 220, 553 P.2d 672, 673 (1976) ("[D]enial of receipt rebuts a prima facie case of mailing and creates an issue of fact for resolution by the trier of fact.").  Thus, the issues surrounding the mailing and receipt of the September 20 letter are questions of fact to be determined by the trier. *Id.; see also Pizitz v. Ryan*, 403 So. 2d 222, 223 (Ala. 1981); *Liquorama, Inc. v. American Nat'l Bank & Trust Co.*, 408 N.E.2d 373, 375 (Ill. App. Ct. 1980); *D & L Enters., Inc. v. Davenport*, 507 P.2d 373, 374 (Utah 1973).  Equitable considerations aside, as noted in ¶18, *supra*, a finding of actual receipt of a notice of intent to exercise an option ultimately is critical, in that "the notification that the option has been exercised must be received by the offeror" by the agreed-upon time. Restatement (Second) of Contracts § 63 cmt. f (1979).

14

timely exercise the option and, if so, under what conditions?  We therefore turn to that issue.

## III.   Availability of Equitable Relief

### A.

¶24      Generally, Arizona courts have strictly construed options in lease agreements because such provisions allow the optionee freedom to exercise or not exercise the option, whereas the optionor is bound by the option.  *See Oberan v. Western Machinery Co.*, 65 Ariz. 103, 109, 174 P.2d 745, 749 (1946) ("The general rule seems to be that an option must be exercised strictly according to the terms and conditions in the option."); *Rogers v. Jones*, 126 Ariz. 180, 182, 613 P.2d 844, 846 (App. 1980) ("'Since the optionor is bound while the optionee is free to accept or not as he chooses, courts are strict in holding an optionee to exact compliance with the terms of the option.'"), *quoting Hayward Lumber & Inv. Co. v. Construction Prods. Corp.*, 255 P.2d 473, 478 (Cal. Dist. Ct. App. 1953); *University Realty*, 19 Ariz. App. at 490, 508 P.2d at 749 (recognizing rule of "strict compliance" governing exercise of options to extend or renew leases).

¶25      Other courts are in accord.  *See*, *e.g.*, *Brent Liquid Transport, Inc. v. GATX Leasing Corp.*, 650 F. Supp. 467, 472

15

(N.D. Miss. 1986) ("Option contracts do not come within the equitable rule against forfeiture, inasmuch as failure to comply strictly with the conditions of the option deprives no party of any right and abrogates no contract."); *Duncan v. G.E.W., Inc.*, 526 A.2d 1358, 1364 (D.C. 1987) ("[A]n optionee is required to comply strictly with the terms of the option agreement."); *SDG Macerich Properties*, 648 N.W.2d at 586 (option provision in lease agreement "will be strictly construed if its words are clear and unambiguous"); *Guy Dean's Lake Shore Marina, Inc. v. Ramey*, 518 N.W.2d 129, 131 (Neb. 1994) ("[A]cceptance of an option to extend a lease must be strictly in accordance with the terms of the option."); *Utah Coal & Lumber Restaurant, Inc. v. Outdoor Endeavors Unlimited*, 40 P.3d 581, ¶11 (Utah 2001) ("[I]n order to exercise an option to renew a lease, a lessee must strictly comply with the terms of the lease's option renewal provisions.").

¶26 Notwithstanding that general rule, the trial court invoked its equitable power and ordered specific performance of Blake's option to purchase the property. In so ruling, the trial court adopted and applied a three-prong test set forth in Corbin's treatise on contract law. In a section entitled "Missed Deadlines in Option Contracts," that treatise states:

> Where the option is not a "mere" option, but part of a more complex transaction such as an option to renew a lease, a lessee's option to purchase, . . . or some other transaction involving an on-

16

going relationship, other considerations come into play.

Thus, it has been held that the power of the holder of an option to buy or renew, contained in a lease, is not necessarily terminated by failure to give notice of exercise within the specified time. If, in expectation of exercising the power, the lessee has made valuable improvements, and the delay is short without any change of position by the lessor, the lessee will be given specific performance of the contract to sell or to renew. This is often for the purpose of avoiding an inequitable forfeiture, but even where no inequitable forfeiture will occur, specific performance or other appropriate remedy will nevertheless be given if there has been such reliance on the promise as to make literal compliance with the option limitation unconscionable. And even beyond unconscion-ability, it is to be remembered that where the option is part of a larger contract, notions of substantial performance normally apply to time periods stated in the contract. General rules governing the construction and operation of contracts should override the rules of offer and acceptance in such cases.

At times, courts pronounce a formula to explain when the late exercise of an option will be excused. Commonly, one finds a three part test: (a) that the delay be slight, (b) that the delay has not prejudiced the other party by a change of position, and (c) that a failure to grant relief would result in such hardship as to make literal enforcement of the renewal provision unconscionable. While such formulas can be the beginning of analysis, the following statement more accurately reflects the law-in-action: "In all of these cases, however, the determination of the court turns not on a single factor but on balancing the equities between the parties." In no event will relief be given if it appears that the optionee delayed acceptance to speculate without risk.

17

1 Arthur Linton Corbin, *Corbin on Contracts* § 2.15, at 201-03
(Joseph M. Perillo ed., rev. ed. 1993), *quoting Gardner v. HKT
Realty Corp.*, 744 S.W.2d 735, 738 (Ark. Ct. App. 1988).

¶27    Thus, under the so-called "Corbin rule," in certain
cases, a court may intervene and equitably excuse an optionee's
untimely notice of intent to exercise an option when (1) the
delay in giving notice is short or slight, (2) the delay does not
prejudice the optionor by a change of position, and (3) because
of the lessee's valuable improvements to the property, refusal to
permit exercise of the option would result in such hardship as to
make strict, literal enforcement of the option provision
unconscionable.  That rule apparently stems from *F.B. Fountain
Co. v. Stein*, 118 A. 47 (Conn. 1922).  The court there excluded
from equitable relief an optionee's failure to timely exercise an
option due to willful or gross negligence.  But, the court
stated,

> [I]n cases of mere neglect in fulfilling a
> condition precedent of a lease [for
> exercising a lease renewal option], which do
> not fall within accident or mistake, equity
> will relieve when the delay has been slight,
> the loss to the lessor small, and when not to
> grant relief would result in such hardship to
> the tenant as to make it unconscionable to
> enforce literally the condition precedent
> [the option] of the lease.

*Id*. at 50.

¶28    In the eighty-plus years since the *F.B. Fountain* case,
courts across the country have split fairly evenly on the issue
of whether equitable relief potentially is available to an

18

optionee who negligently failed to timely or properly exercise an option to renew a lease or to purchase the leased property. *See generally* William B. Johnson, Annotation, *Circumstances Excusing Lessee's Failure to Give Timely Notice of Exercise of Option to Renew or Extend Lease*, 27 A.L.R.4th 266 (1984). Some courts permit equitable relief even in cases of negligence,[4] while other courts do not.[5]

---

[4]*See*, *e.g.*, *Record Club of America, Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1272-74 (2d Cir. 1989) (on remand, equitable intervention appropriate if delay was result of negligence or inadvertence, there is no prejudice to the optionor, and denial of relief would result in forfeiture to optionee); *Aickin v. Ocean View Invs. Co.*, 935 P.2d 992, 1000 (Haw. 1997) ("only willful, intentional, indifferent, or grossly negligent conduct bars equitable relief—mere negligence does not"; relief granted despite negligent four-month delay in giving notice due to "oversight"); *Trollen v. City of Wabasha*, 287 N.W.2d 645, 647 (Minn. 1979) (granting equitable relief when delay was due to tenant's negligent failure to ascertain his formal obligations under the lease and adopting the "modern rule" permitting "a court of equity to relieve against loss of an option to extend a lease when there has been excusable and inconsequential tardiness"); *Fletcher v. Frisbee*, 404 A.2d 1106, 1108-09 (N.H. 1979) (Corbin rule applies if delay resulted from accident or honest mistake; equitable relief granted when lessee's attorney sent notice by regular mail a week late, although option clause required notice by registered mail); *Soho Dev. Corp. v. Dean & DeLuca, Inc.*, 517 N.Y.S.2d 498, 500 (N.Y. App. Div. 1987) (negligent delay excusable if tenant otherwise would suffer a forfeiture).

[5]*See*, *e.g.*, *Bekins Moving & Storage Co. v. Prudential Ins. Co.*, 221 Cal. Rptr. 738, 742 (Ct. App. 1985); *Simons v. Young*, 155 Cal. Rptr. 460, 470-72 (Ct. App. 1979); *SDG Macerich Properties, L.P. v. Stanek, Inc.*, 648 N.W.2d 581, 585-86, 589 (Iowa 2002); *Rounds v. Owensboro Ferry Co.*, 69 S.W.2d 350, 356 (Ky. Ct. App. 1934) ("[T]he right to renew the lease was lost by plaintiff's failure to give the notice which was due entirely to the neglect of its agents and officers and not to any misleading conduct or act on the part of any of the lessors."); *Koch v. H. & S. Dev. Co.*, 163 So. 2d 710, 724 (Miss. 1964); *Guy Dean's Lake Shore Marina, Inc. v.*

¶29    The trial court did not specifically characterize the nature of Blake's conduct but, rather, concluded as a matter of law that all three prongs of the Corbin test were met, ruling that "the delay was slight[,] the delay did not prejudice or harm [Andrews,] . . . [and] loss of the opportunity to purchase this property through the option would result in substantial economic harm to [Blake]."  In contrast, in reversing the trial court's judgment and directing entry of summary judgment in favor of Andrews, the court of appeals concluded "as a matter of law [that] Blake's failure to timely exercise the option was due solely to his own lack of diligence."  Based on *Monihon v. Wakelin*, 6 Ariz. 225, 56 P. 735 (1899), the court rejected the Corbin rule, noting that, "in Arizona, negligence on the part of the optionee is not excused."  Thus, the court concluded, equity could not excuse Blake's negligent failure to timely and properly exercise the option to purchase.

¶30    We reject the trial court's blanket adoption of the Corbin rule and that court's disposition of this case as a matter of law under that rule.  And, although we agree with some aspects of the court of appeals' decision, we disagree with others.  We agree that the Corbin rule is not compatible with *Monihon*,

---

*Ramey*, 518 N.W.2d 129, 133 (Neb. 1994); *Kern v. Clear Creek Oil Co.*, 778 N.E.2d 115, ¶24 (Ohio Ct. App. 2002); *American Oil Co. v. Rasar*, 308 S.W.2d 486, 491 (Tenn. 1957); *Crown Constr. Co. v. Huddleston*, 961 S.W.2d 552, 558-59 (Tex. App. 1997); *Utah Coal & Lumber Restaurant, Inc. v. Outdoor Endeavors Unlimited*, 40 P.3d 581, ¶14 (Utah 2001); *Sentara Enters., Inc. v. CCP Assocs.*, 413 S.E.2d 595, 597-98 (Va. 1992).

insofar as it permits a court to equitably excuse an optionee's *negligent* failure to timely or properly exercise an option to renew a lease or to purchase leased property.

¶31     In *Monihon*, the Territorial Supreme Court permitted a tenant to enforce an option to renew a commercial lease after missing the contractual deadline.  The tenant had failed to exercise the option to renew because he was physically and mentally incapacitated from having been thrown from his horse two days before the option expired.  Upon his recovery approximately one month later, the tenant served his landlord with notice that he intended to exercise the option to renew.  The landlord, who in the interim had entered into negotiations with a third party to rent the premises, refused to renew the lease, claiming that the tenant had forfeited his right of renewal by failing to give timely notice.  In the tenant's ensuing action for specific performance to renew the lease, the trial court granted that relief.  The supreme court affirmed, stating:

> [A] court of equity, in relieving against the consequences of unavoidable failure to perform the contract within the time specified, does so upon the theory that it is enforcing the contract in the true intent and meaning of the parties; for it will not be regarded that anything more is intended by such a contract than that there should be perfect good faith, and utmost diligence to perform its terms within the time specified. Anything short of the utmost good faith and diligence on the part of the party seeking to be relieved from the consequences of a failure to conform strictly to the terms of such contract will not be regarded as sufficient; but where it appears that by the act of the other party, or by unavoidable

21

> accident of such character as could not be
> foreseen and guarded against, the performance
> of the contract with the exercise of due
> diligence was rendered impossible, and the
> party at the earliest opportunity performed
> his part of the contract, the court will
> enforce it, provided this can be done, and
> the parties be left in the same relative
> position they would have been in, had no
> delay occurred in the performance of the
> contract according to its terms.

*Id*. at 233-34, 56 P. at 736-37.

¶**32**      Thus, under *Monihon*, the rule in Arizona is that an optionee must exercise utmost diligence in performing the terms of the option within the specified time.  And, equity will intervene and excuse a lessee's failure to timely exercise an option to renew or purchase only when the lessee's incapacitation or unavoidable accident or the lessor's actions rendered timely performance impossible.

¶**33**      Blake urges us to adopt the Corbin rule and to follow the *F.B. Fountain* approach, as the trial court implicitly did, by permitting equitable relief even in cases of negligent failure to timely exercise an option to purchase leased property, as long as the lessee's conduct is neither willful nor grossly negligent. According to Blake, the language in *Monihon* that requires "utmost good faith and diligence on the part of the party seeking to be relieved from the consequences of a failure to conform strictly to the terms" of the option is mere dicta and now outdated.  *Id*. at 234, 56 P. at 736.  But, even assuming that language in *Monihon* is dicta, other Arizona case law and sound policy reasons

22

support a rule that precludes equitable relief for a party who negligently failed to timely and properly exercise an option to purchase leased property.

¶**34**     Several well-established principles in Arizona law conflict with the broad equitable rule Blake urges.  First, as noted in ¶24 above, we have held that an option must be exercised strictly according to the terms and conditions in the option. *See Oberan*, 65 Ariz. at 109, 174 P.2d at 749; *see also Christmas v. Turkin*, 148 Ariz. 602, 603, 716 P.2d 59, 60 (App. 1986); *Ensign v. Bohn*, 1 Ariz. App. 386, 388, 403 P.2d 321, 323 (1965) (denying equitable relief when plaintiff failed to exercise option to purchase real estate within specified time period). Second, this court has recognized that an option cannot be extended beyond the contractual term in the absence of waiver, estoppel, fraud, or misrepresentation.  *See Ernst v. Deister*, 42 Ariz. 379, 384, 26 P.2d 648, 650 (1933) (denying equitable relief to a party who tried to exercise a recently expired right of redemption).  As we stated in *Ernst*, "[t]he courts will go a long way to protect persons . . . on the grounds of fraud, waiver, or estoppel, or part performance . . . but they cannot, and will not, make a new contract for the parties and specifically compel its performance." *Id*.  Third, time is of the essence in option contracts, even when the contract does not include an express statement to that effect.  *Id*. at 382, 26 P.2d at 649; *see also*

*Monihon*, 6 Ariz. at 233, 56 P. at 736 (recognizing that time is of the essence in an option contract to renew a lease).

¶35    In short, a rule that would equitably excuse an optionee's negligent failure to timely and properly exercise an option to purchase leased property is inconsistent with Arizona's jurisprudence. In addition, cogent policy reasons support an equitable rule more narrow in scope than that adopted in *F.B. Fountain* and its progeny. As the Utah Supreme Court recently noted: "[A] broad exception that grants relief from a [negligent] failure to comply with the lease anytime the delay is slight, the lessor's loss is small, and the lessee would suffer a hardship comes close to swallowing the general rule of strict compliance. Such an exception would apply equitable excuse in almost all cases." *Utah Coal & Lumber Restaurant*, 40 P.3d 581, ¶16. Accordingly, the Utah court held that "the failure to strictly comply with a lease's option renewal terms may be equitably excused only when the failure is caused by instances of fraud, misrepresentation, duress, undue influence, mistake, or the lessor's waiver of its right to receive notice." *Id.* at ¶18. And, the court noted, "equity should not be applied in situations where the lessee's negligence, inadvertence, or neglect caused the failure to exercise a lease renewal option." *Id.* at ¶14; *see also U.S. Realty 86 Assocs. v. Security Inv., Ltd.*, 40 P.3d 586, ¶13 (Utah 2002) ("Negligence, regardless of the type, may not, by itself, serve as grounds for equitable relief.").

24

¶36    Similarly, the Iowa Supreme Court has held that "equitable relief is not available for a commercial party who, through its own carelessness, failed to timely exercise its option to renew a lease agreement." *SDG Macerich Properties*, 648 N.W.2d at 589.  As that court noted: "To hold otherwise would do nothing more than create instability in business transactions and disregard commercial realities.  'If the terms of options involving property rights are not strictly construed, Pandora's Box is opened for serious property title problems to develop.'" *Id.* at 588, *quoting Robinson v. Martel Enters., Inc.*, 337 So. 2d 698, 704 (Miss. 1976) (footnote omitted).  In order to avoid such problems and to "preserve not only sanctity of contract but also protect the integrity of the fundamental grounds upon which the rules of equitable relief are founded," the court "decline[d] to jeopardize freedom of contract by stepping in and rewriting the parties' agreement to relieve the consequences of [the tardy optionee's] mere forgetfulness." *Id*. at 589.  As the court aptly noted:

> "While rules and principles of equity jurisprudence are constantly expanding in the aspiration for justice in the administration of law by the courts, they should never forget that 'the sprout is to savor of the root, and go the same way.'" *Rounds* [*v. Owensboro Ferry Co.*, 69 S.W.2d 350, 356 (Ky. Ct. App. 1934)].  Even where strict enforcement of the contract results in hardship, we cannot change the rights of the parties absent ameliorating circumstances. Hard cases make bad law.  "Hard cases must not be allowed to make bad equity, any more

25

than bad law." *Moore v. Pierson*, 6 Iowa 279, 297 (1858).

*SDG Macerich Properties*, 648 N.W.2d at 589.

¶37    We concur with those observations and find the approach taken in Utah and Iowa most in keeping with sound policy and Arizona common law.  Accordingly, we hold that a lessee's failure to strictly comply with the terms of a lease's option to renew or purchase may be equitably excused only when the failure is caused by incapacity, fraud, misrepresentation, duress, undue influence, mistake,[6] estoppel, or the lessor's waiver of its right to receive notice.  Limiting equitable relief in that manner serves the important goal of giving finality and predictability to a contract's meaning.  In contrast, permitting equitable relief in cases of mere negligence would frustrate that objective.  We further hold that, if the optionee shows one of the aforementioned circumstances under which equitable relief may be available, an optionee's nonnegligent failure to timely

---

[6]We note that "in equity a mistake cannot be based on a negligent act or omission." *Utah Coal & Lumber Restaurant*, 40 P.3d 581, ¶20.  Rather, "'[a] mistake within the meaning of equity is a non-negligent but erroneous mental condition, conception, or conviction induced by ignorance, misapprehension, or misunderstanding, resulting in some act or omission done or suffered by one or both parties, without its erroneous character being intended or known at the time.'" *Id*., *quoting* 27A Am. Jur. 2d *Equity* § 7, at 525 (1996).  *But see Duncan v. G.E.W., Inc.*, 526 A.2d 1358 (D.C. 1987) (granting relief on basis of "mistake" when tenant so misread language of the contract that he believed he did not have to give notice in a circumstance in which notice was required).  We also note that mere "[f]orgetfulness is not the equivalent of a mistake." *SDG Macerich Properties*, 648 N.W.2d at 587.

26

exercise an option to renew a lease or purchase leased property may be excused only if the three prerequisites of the Corbin rule are met, namely: (1) the delay was short, (2) the delay did not prejudice the lessor/optionor, and (3) the lessee/optionee would suffer a forfeiture or other substantial hardship if equitable relief is not granted.[7]

**B.**

¶38 Having concluded that equity will not relieve an optionee's fault in failing to timely and effectively exercise an option, the question remains how Blake's conduct here should be characterized. We disagree with the court of appeals that, as a matter of law, Blake was negligent for allegedly having resorted to regular mail to give notice of his intent to exercise the option. *See Gold Standard Enters., Inc. v. United Investors Mgmt.*

---

[7]Andrews contends that equitable relief under the Corbin rule or a similar approach should extend, at most, to options to renew leases, not options to purchase leased property. The Corbin rule, however, draws no such distinction. Rather, it expressly includes within its scope options "to buy or renew." 1 Arthur Linton Corbin, *Corbin on Contracts* § 2.15, at 201 (Joseph M. Perillo ed., rev. ed. 1993). And some courts have upheld equitable relief in cases that directly or at least tangentially involved options to purchase. *See Hunt v. Carlson*, 523 N.Y.S.2d 699, 701 (N.Y. App. Div. 1988) (equitable rules for excusing tenant's delayed exercise of option "apply with equal force to a purchase option as well as to an option to renew"); *see also Gardner v. HKT Realty Corp.*, 744 S.W.2d 735 (Ark. Ct. App. 1988); *Duncan*, 526 A.2d at 1365; *cf. Temple Emanu-El v. Attorney General*, 660 N.Y.S.2d 41 (N.Y. App. Div. 1997). We are not persuaded by Andrews's argument on this point and, therefore, conclude that, in a proper case, equity may excuse a nonnegligent failure to timely exercise an option to purchase contained in a lease, as long as all requisite conditions for equitable relief are met.

*Co.*, 538 N.E.2d 636 (Ill. App. Ct. 1989) (notice timely mailed but not received due to tenant's alleged failure to apply proper postage); *Sy Jack Realty Co. v. Pergament Syosset Corp.*, 267 N.E.2d 462, 464 (N.Y. 1971) (letter exercising option mailed but not received, and no prejudice to landlord; "[i]f reliance on the mails could possibly be characterized as fault, it is 'excusable fault' . . . and should not operate to deprive the [tenant] of a valuable asset"); *Southern Region Indus. Realty, Inc. v. Chattanooga Warehouse & Cold Storage Co.*, 612 S.W.2d 162 (Tenn. Ct. App. 1980) (notice timely mailed but not received).

¶39    The court of appeals' view is inconsistent with our conclusion that the addendum did not require Blake's exercise of the option, or even other notices, to be delivered by one of the nonexclusive methods specifically prescribed in the addendum. *See* ¶¶18-20, *supra*.  And, as noted in ¶22 above, if the trier of fact finds that Andrews received Blake's September 20 letter before October 1, 1999, then Blake is entitled to judgment as a matter of law and need not resort to equitable relief.

¶40    Conversely, however, we also reject Blake's assertion at oral argument that, as a matter of law, he was not negligent and, therefore, is necessarily entitled to the equitable relief of specific performance.  As noted in ¶18 above, effective exercise of the option required Andrews's actual and timely receipt of written notice from Blake.  *See Korey; Salminen; Sy Jack Realty Co.*  Thus, if the trier finds that Andrews did not

28

receive Blake's September 20 letter, despite Blake's allegation that he timely and nonnegligently attempted to give notice through that letter, then Blake failed to effectively exercise the option before the October 1 deadline.  In that event, Blake's first, *effective* exercise of the option was untimely because it occurred on October 23, when Andrews admittedly received Blake's October 21 letter.  And, under that scenario, the trier of fact, under proper instructions, must determine whether Blake acted negligently, or rather, through mistake, in failing to timely and effectively exercise the option.[8]

¶41      In our view, assuming Andrews did not receive Blake's September 20 letter, resolution of the issue of whether Blake was negligent depends on evaluation of the parties' prior dealings and all other relevant circumstances.  If Andrews did not timely receive that first letter, of course, the ultimate question is whether Blake acted as a reasonably prudent person under the circumstances, despite his failure to timely exercise the option. That fact-intensive inquiry is not susceptible to summary resolution.  Rather, the issues raise classic factual questions for the trier of fact.  To be sure, a court may find an absence of negligence in some cases as a matter of law.  *See Coburn v. City of Tucson*, 143 Ariz. 50, 53, 691 P.2d 1078, 1081 (1984).

---

[8]Because Blake has neither alleged nor presented evidence of incapacity, fraud, misrepresentation, duress, undue influence, estoppel, or waiver by Andrews of his right to receive timely notice, none of those equitable exceptions applies, at least based on the current record.

29

Generally, however, "the question of negligence is one of fact for a jury to decide," particularly when, as here, reasonable minds could differ on whether a party has breached his or her duty of exercising reasonable care. *Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 358, 706 P.2d 364, 370 (1985); *see also Chambers v. Western Arizona CATV*, 130 Ariz. 605, 638 P.2d 219 (1981).

¶42     Thus, depending upon the course of further proceedings and the trier's ultimate factual findings, analysis of the Corbin factors may be required.  Accordingly, we now turn to those factors and the evidence of record relating thereto.

## C.

¶43     Blake contends the evidence "undisputedly satisfie[s] the Corbin Rule, as [Andrews] admitted receiving written notice of [Blake's] exercise of the Option by October 23, only 22 days after the expiration date of October 1, there was no legal prejudice to [Andrews] and [Blake's] investment in and improvements of the Property were substantial."  We agree with Blake as to the first prong of the Corbin test but, unlike the trial court, do not agree that Blake is entitled to summary judgment on the second and third prongs.

¶44     Under Corbin's first prong, the delay in exercising the option must have been "short" or "slight." *Corbin on Contracts* § 2.15, at 202, 203.  Assuming Andrews did not receive Blake's September 20 letter, he admittedly received actual,

30

written notice of Blake's exercise of the option on October 23. That relatively brief delay satisfies the first prong of the Corbin test. Andrews does not contend otherwise, and case law supports that conclusion. *See Monihon* (twenty-three-day delay in exercising option to renew lease did not preclude equitable relief); *Aickin v. Oceanview Invs. Co.*, 935 P.2d 992, 998 (Haw. 1997) (equitable relief granted despite four-month delay in giving notice); *Ward v. Washington Distribs., Inc.*, 425 N.E.2d 420, 422 (Ohio Ct. App. 1980) (equitable relief granted despite thirty-day delay in exercising option); *Beltrone v. Danker*, 643 N.Y.S.2d 720, 721 (N.Y. App. Div. 1996) (equitable relief granted despite two-month delay in exercising option).

¶45        Under Corbin's second prong, the delay in exercising the option must not have prejudiced the optionor by inducing a change of position. In granting summary judgment for Blake, the trial court ruled that it was "almost beyond dispute" that "the delay did not prejudice or harm [Andrews]." Although Andrews's argument on this point is unclear, he apparently claims prejudice from having lost $650,000 in additional income if he is required to sell the property to Blake at the option price of $300,000 rather than to Albertson's at the negotiated contract price of $950,000.

¶46        The test to determine whether a lessor suffered any injury from tardy exercise of an option "is whether he changed his position or suffered a detriment because of the Lessee's

31

delay in giving notice." *Aickin*, 935 P.2d at 1001. Thus, the issue is not whether the lessor/optionor is prejudiced by the lessee's exercise of an option to renew or purchase but, rather, whether the lessor is prejudiced "because of the delay" in that exercise. *Sy Jack Realty Co.*, 267 N.E.2d at 464. The mere fact that a lessor negotiated with other prospective lessees during the period of delay but with whom the lessor did not "enter[] into any binding agreement" does not necessarily constitute prejudice. *Monihon*, 6 Ariz. at 232, 56 P. at 736; *see also Southern Region Indus. Realty, Inc.*, 612 S.W.2d at 165 (that lessor had begun looking for a new tenant when lease was not renewed according to its terms did not preclude equitable relief). But "[h]ardship would exist if active negotiations regarding the sale of the property had been in progress when the notice deadline arose and the landlord lost the sale because of the lessee's delay." *Fletcher v. Frisbee*, 404 A.2d 1106, 1108 (N.H. 1979).

**¶47** Although Andrews had some preliminary communications with Albertson's and its agent, he apparently had no firm agreement or understanding that Albertson's would purchase the property as of October 23, 1999. Indeed, Andrews acknowledged that, as late as November 10, he had "no real expectation" that Albertson's would purchase the property and conceded that Albertson's "could have walked away at any time." Andrews further admitted that, during October, his discussions with

32

Albertson's were "all very, very preliminary-type stuff" in which he did not "put a whole lot of stock." Notwithstanding that evidence, the record does not clearly reflect the precise status of Andrews's negotiations with Albertson's as of late October or the impact Blake's tardy exercise of the option actually had on Andrews's prospective sale of the property. Accordingly, in view of our remand of the case, we do not foreclose the parties' further discovery and litigation on remand on the issue of prejudice. At this juncture at least, we deem summary disposition of that issue inappropriate.

¶48     The same is true with respect to Corbin's third prong—that a failure to grant equitable relief would result in such hardship to the optionee as to make literal enforcement of the option provision unconscionable. Pointing to the following facts set forth in his affidavit, Blake contends he would suffer substantial harm if the option were forfeited and he were forced to vacate the property. First, Blake claims he would lose the ability to conduct his business, which generates approximately $6,000,000 in annual revenue, on the property. According to Blake, he also would effectively lose the ability to conduct a nursery business on some adjoining property that he purchased in 1997 for $300,000 in reliance on the option. Blake further attested that he would have to incur approximately $100,000 in expenses to relocate and store inventory currently on the property. In addition to the $10,000 he paid pursuant to the addendum to "extend" the option to October 1, 1999, Blake also

33

spent over $40,000 in improvements to the property in reliance on his ability to purchase it.  And he expended more than $19,000 in legal fees to obtain and maintain a special use zoning permit to allow him to continue to operate a plant and tree nursery on the property when the City of Phoenix challenged that right.

¶49     Blake's expenditures relating to the property clearly are substantial.  But other evidence in the record suggests that most of the $59,000 Blake spent on improvements and legal fees resulted from a criminal misdemeanor citation against him for violating the city zoning code and his consequent need to conform the nursery to that code.  In addition, Blake purchased two parcels of adjoining and nearby property, six acres and 2.3 acres in size, which arguably could be resold or used (as they have been) for his nursery, even without the property leased from Andrews.  In short, conflicting evidence in the record may support different findings and inferences relating to the hardship issue.

¶50     A lessee who seeks equitable relief from an untimely exercise of an option must show that he or she would suffer substantial harm or hardship if evicted.  *Fletcher*, 404 A.2d at 1109.  Courts have weighed various factors in evaluating and determining the hardship element, including substantial expenditures in making improvements to the property;[9] lack of

_____

[9]*See Gardner*, 744 S.W.2d at 738 (lessee made over $290,000 in improvements to the property over a twenty-year period); *Duncan*, 526 A.2d at 1364 (lessee expended over $400,000 on fourteen

34

other available space;[10] convenience of operation at the leased premises;[11] loss of advantage of the business's strategic location;[12] loss of business goodwill;[13] and cost and inconvenience of any necessary move.[14]

¶51    Although the trial court noted several "disputed facts" relating to the third prong of the Corbin test, the court nonetheless concluded as a matter of law that that prong was satisfied.  Noting Blake's reliance on *Southern Region Industrial Realty*, the trial court ruled that "the exact amount of the harm [to Blake] may not be known, [but] it is known that there will be harm."  And, noting that Blake would "suffer harm if the option is not exercised," the trial court found it "obvious" that "loss of the opportunity to purchase this property through the option would result in substantial economic harm to [Blake]."

---

different properties); *Aickin*, 935 P.2d at 1001 (lessees expended over $140,000 in improvements to the premises, which was also "'fully leveraged'"); *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.*, 366 N.E.2d 1313, 1317 (N.Y. 1977) (lessee expended $55,000 on improvements).

    [10]*See Galvin v. Simons*, 25 A.2d 64, 66 (Conn. 1942); *Soho Dev. Corp.*, 517 N.Y.S.2d at 500.

    [11]*See Galvin*, 25 A.2d at 65.

    [12]*See Fletcher*, 404 A.2d at 1109; *Soho Dev. Corp.*

    [13]*See Fletcher*; *J.N.A. Realty Corp.*, 366 N.E.2d at 1317; *Sy Jack Realty Co. v. Pergament Syosset Corp.*, 267 N.E.2d 462, 464 (N.Y. 1971).

    [14]*See Galvin*, 25 A.2d at 66; *Fletcher*, 404 A.2d at 1109; *Soho Dev. Corp.*

¶52    We disagree with the trial court's summary resolution of the hardship issue.  In *Southern Region Industrial Realty*, the Tennessee court concluded that a "complete loss of the business operation" justified equitable relief.  612 S.W.2d at 165.  In that case, the lessee had been leasing the facilities for over fifteen years, no equivalent facilities were available in the area, and the cost of building a similar facility would have been in excess of $6,000,000.  *Id.*  In contrast, viewed in the light most favorable to Andrews, the record does not establish that Blake would suffer a "complete loss of [his] business operation" were he unable to exercise the option.  *Id*.  Indeed, as noted above, Blake arguably could continue to operate his nursery on the eight-plus acres of property he owns both adjacent to and within 200 feet of the Andrews property.

¶53    The trial court erred in granting summary judgment on the third Corbin prong because, as Corbin points out, the facts must be fully developed and the court must then evaluate the nature and degree of harm to the optionee, balance the equities, and determine whether prohibiting exercise of the option would be so unconscionable that equitable relief is appropriate.  *Corbin on Contracts* § 2.15, at 203.  As far as we can tell, the trial court did not conduct that type of balancing of the relevant factors.  Moreover, that Blake would suffer some harm if he were unable to exercise the option is not the controlling test.  Rather, under the Corbin rule, the hardship must be so severe as

36

to make literal enforcement of the option provision "unconscionable." *Id.*

## ATTORNEY'S FEE REQUESTS

¶54      Both parties have requested an award of attorney's fees pursuant to both A.R.S. § 12-341.01 and a mandatory fee provision in their lease agreement.[15]  In his petition for review, Blake did not request an award of attorney's fees. Rather, he first requested a fee award in his supplemental brief filed with this court seven months later, shortly before oral argument.  Because that request was untimely, Blake would not be entitled to an award of fees even if he were the prevailing party.  *See* Ariz. R. Civ. App. P. 21(c), 17B A.R.S.  ("If a petition or cross-petition for review is filed, a request for allowance of attorneys' fees shall be made in the petition or cross-petition for review or response thereto.").

¶55      Andrews requested an award of attorney's fees in his response to Blake's petition for review.  But Andrews has not clearly prevailed in the proceedings before this court.  And, at this stage of the case, we cannot determine which party ultimately will be "successful."  § 12-341.01.  Accordingly, we decline to grant attorney's fees to either party at this point in the litigation; any award of fees should abide completion of the

---

[15]The lease provides:  "If either party brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, on trial or appeal, shall be entitled to his reasonable attorney's fees to be paid by the losing party as fixed by the court."

proceedings on remand in the trial court. *See Leo Eisenberg & Co. v. Payson*, 162 Ariz. 529, 535, 785 P.2d 49, 55 (1989).

## CONCLUSION

**¶56**     In summary, we vacate the court of appeals' decision, reverse the trial court's judgment, and remand the case for further proceedings consistent with this opinion. If the trier of fact finds that Blake mailed and Andrews received Blake's September 20 letter before the October 1 deadline, the trial court should enter judgment in favor of Blake, without the need for analysis of the Corbin factors. On the other hand, if the trier finds that Andrews did not receive that letter, the trier must then determine whether Blake's failure to timely exercise the option was negligent. If negligence is found, equitable relief is precluded. But if Blake's untimely exercise of the option was due to mistake or other circumstance under which equitable relief is permitted, rather than any fault on his part, then the Corbin rule applies.

**¶57**     In that event, the trial court must conduct a balancing test to evaluate and determine the second and third Corbin factors—prejudice to Andrews caused by the delay and whether a refusal to equitably permit Blake to exercise the option would create such hardship on him as to make strict enforcement of the option deadline unconscionable. In resolving those issues, the trial court may deem an evidentiary hearing necessary or helpful. We leave that option to the trial court's

38

sound discretion in exercising its equitable powers.

_____
                              John Pelander, Judge*

CONCURRING:


_____
Charles E. Jones, Chief Justice


_____
Ruth V. McGregor, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
J. William Brammer, Jr., Judge*

*Pursuant to Ariz. Const. art. VI, § 3, the Honorable A. John
Pelander and the Honorable J. William Brammer, Jr., Judges of the
Arizona Court of Appeals, Division Two, were designated to sit on
this case.