SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| CLIFFORD J. OCHSER, a single man, ) | Arizona Supreme Court |
| ) | No. CV-11-0028-PR |
| ) | |
| Plaintiff/Appellant, ) | Court of Appeals |
| ) | Division One |
| v. ) | No. 1 CA-CV 09-0141 |
| ) | |
| DEPUTY GERARD FUNK, in his ) | Maricopa County |
| individual capacity as a deputy ) | Superior Court |
| with the Maricopa County ) | No. CV2006-006624 |
| Sheriff's Office, and JANE DOE ) | |
| FUNK, husband and wife; SERGEANT ) | |
| ANTHONY R. CRUZ, in his ) | |
| individual capacity as a deputy ) | **O P I N I O N** |
| with the Maricopa County ) | |
| Sheriff's Office, and JANE DOE ) | |
| CRUZ, husband and wife, ) | |
| ) | |
| Defendants/Appellees. ) | |
| ) | |
| _____ ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Joseph B. Heilman, Judge
The Honorable Robert E. Miles, Judge

**AFFIRMED**
_____

Opinion of the Court of Appeals Division One
225 Ariz. 484, 240 P.3d 1246 (App. 2010)

**VACATED**
_____


ROBBINS & CURTIN, P.L.L.C.                                    Phoenix
     By   Joel B. Robbins
          Anne E. Findling
Attorneys for Clifford J. Ochser

JONES, SKELTON & HOCHULI, P.L.C.                              Phoenix
     By   Eileen Dennis GilBride


1

Attorney for Gerard Funk, Jane Doe Funk, Anthony R.
        Cruz, and Jane Doe Cruz

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                Phoenix
     By   Paula S. Bickett, Assistant Attorney General
          Daniel P. Schaack, Assistant Attorney General
Attorneys for Amicus Curiae State of Arizona

LASOTA & PETERS PLC                                      Phoenix
     By   Kristin M. Mackin
          William J. Sims, III
Attorneys for Amici Curiae Arizona Municipal Risk
          Retention Pool, The League of Arizona Cities
          and Towns, and The Arizona Counties Insurance
          Pool
_____

**P E L A N D E R**, Justice

¶1        Clifford Ochser brought this civil rights action against two deputy sheriffs for arresting him on a warrant that had been quashed some thirteen months earlier.  Although we hold that Ochser's arrest was an unreasonable seizure prohibited by the Fourth Amendment, we conclude that the deputies are entitled to qualified immunity because then-existing law did not clearly establish the unconstitutionality of their actions.

### I.  FACTUAL AND PROCEDURAL BACKGROUND

¶2        We view the facts in the light most favorable to Ochser, against whom summary judgment was entered below. *Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12, 69 P.3d 7, 11 (2003).  In January 2003, after Ochser did not appear at a status conference in his marriage dissolution proceeding, a Maricopa County Superior Court judge found him in civil contempt for

2

failure to pay child support and issued an arrest warrant. In March, the court quashed the warrant after determining that Ochser never received notice of the January status conference. The minute entry quashing the warrant indicates it was faxed to the Maricopa County Sheriff's Office ("MCSO"). Nonetheless, as a precautionary measure, Ochser obtained certified copies of the order quashing the warrant, keeping one in his vehicle and one at his office.

¶3     In May 2004, MCSO conducted Operation Mother's Day, in which officers arrested parents with outstanding child-support arrest warrants. Deputies Gerard Funk and Anthony Cruz were assigned several warrants for execution in northern Arizona, including the 2003 warrant for Ochser's arrest. MCSO checked each warrant for validity before assigning it, but despite having been quashed, the warrant showed as active in MCSO's records. Before executing the warrant, the deputies confirmed its validity with the MCSO Operations Information Center ("OIC"), which maintains warrant records.

¶4     On May 5, 2004, Funk and Cruz went to Ochser's workplace at Lowell Observatory in Flagstaff. After Ochser arrived in a company vehicle, the deputies arrested him. Ochser protested, stating the 2003 warrant had been quashed. He told the deputies that he had a certified copy of the court's minute entry quashing the warrant in the inbox at his office, about

twenty yards from the scene of the arrest. One of the deputies replied, "I don't need to go to your office to find anything. I've got everything I need."

¶5 Ochser continued to assert that the warrant had been quashed. After several minutes, Funk went into the observatory. What occurred thereafter is not entirely clear from the record. Funk testified in his deposition that he first called the judge's chambers and talked to a "temp" who did not know how to check warrants, and he then called OIC. After Funk allegedly informed OIC that Ochser insisted the warrant had been quashed, Funk testified that OIC confirmed its validity. Cruz, however, testified that when Funk came out from the building, Funk said he had talked to a court clerk who informed him the warrant was valid.

¶6 MCSO's Records Specialist Supervisor, Julie Ahlquist, testified that if a deputy had called OIC and told her the arrestee insisted that a warrant had been quashed, she would have checked the minute entries website for the Maricopa County Superior Court. According to Ahlquist, taking that step is what reasonable OIC employees do when there is a question of whether the warrant has been quashed. She testified that checking the superior court website typically takes less than ten minutes, and she retrieved the order quashing Ochser's warrant within two

4

minutes at her deposition.[1]

¶7      What is undisputed is that the deputies did not go to Ochser's office to obtain the minute entry quashing the warrant. Ochser was handcuffed, shackled, and taken to Phoenix, where he was jailed overnight.  He was released the next day when it was determined that his warrant had been quashed.

¶8      A defense expert on police procedures testified that if Ochser had told the deputies he had a copy of the order quashing the warrant on his desk, the deputies should have retrieved it.  Similarly, the MCSO captain who supervised Funk and Cruz at the time of the arrest testified that if an arrestee had informed the deputies that he had paperwork showing the warrant had been quashed, the deputies should have checked the paperwork to ensure the warrant was valid, provided that doing so would not jeopardize their safety.

¶9      Ochser filed this action under 42 U.S.C. § 1983 (2006), alleging the deputies violated his Fourth Amendment rights.  The trial court granted the deputies' motion for summary judgment, ruling that an arresting officer is entitled

---

[1]     The OIC Training Guide, however, merely instructs employees to check the physical warrant card.  And Alan Quackenbush, MCSO's Records Lead for the OIC, averred that when a deputy calls to confirm the validity of an arrest warrant, the OIC employee pulls the file containing the physical copies of the warrant cards.  According to Quackenbush, if the "original copy" is in the file, OIC reports the warrant as valid.

5

to qualified immunity when the arrest is made on a facially valid warrant. A divided court of appeals affirmed, concluding that although Ochser had "a broad constitutional right to be free from unreasonable searches and seizures, . . . [i]t is not clearly established that an arresting officer acting pursuant to a facially valid warrant has the obligation to investigate documentary evidence." *Ochser v. Funk*, 225 Ariz. 484, 489 ¶ 17, 240 P.3d 1246, 1251 (App. 2010). The dissenting judge rejected the qualified immunity claim, believing it was "'clearly established' at the time of [Ochser's] arrest . . . that an arresting officer may not disregard documentary evidence offered by a person named on an arrest warrant that proves the warrant is invalid." *Id.* at 494 ¶ 45, 240 P.3d at 1256 (Johnsen, J., dissenting). She concluded that because retrieving the minute entry would not have required "extraordinary effort" or "jeopardized [the deputies'] mission or public safety," no reasonable officer could disagree "that the deputies should have retrieved and inspected the order." *Id.* at ¶ 43.

¶10    We granted review to consider the scope of qualified immunity in the context of arrests made pursuant to a facially valid but quashed warrant, a legal issue of statewide importance. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24 (2003).

## II. DISCUSSION

6

## A. Standard of Review

¶11 We review de novo a grant of summary judgment, viewing the evidence and reasonable inferences in the light most favorable to the party opposing the motion. *Andrews*, 205 Ariz. at 240 ¶ 12, 69 P.3d at 11. Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(c)(1); *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). "The de novo standard also applies to our review of the defendant officers' entitlement to qualified immunity as a matter of law." *Glenn v. Washington Cnty.*, 661 F.3d 460, 465 (9th Cir. 2011).

## B. Qualified Immunity

¶12 Qualified immunity from a § 1983 claim is governed by federal law. *See Weatherford ex rel. Michael L. v. State*, 206 Ariz. 529, 532 ¶ 8, 81 P.3d 320, 323 (2003). The doctrine "shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

¶13 Actions against government officials for money damages raise competing policy considerations. If a government official

abuses his or her office, an "action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (quoting *Harlow*, 457 U.S. at 814) (alteration omitted). But freely permitting lawsuits against government officials "can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Id.*; *accord Harlow*, 457 U.S. at 807 (expressing "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority").

¶14 The qualified immunity doctrine arose to "accommodate[] these conflicting concerns," *Anderson*, 483 U.S. at 638, by "hold[ing] public officials accountable when they exercise power irresponsibly," but "shield[ing] officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (stating qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

¶15 Qualified immunity shields officers not only from ultimate liability, but also from the burdens of litigation. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (stating

qualified immunity is "an *immunity from suit* rather than a mere defense to liability"). Accordingly, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation," *Pearson*, 555 U.S. at 232 (internal quotation marks omitted), including by summary judgment proceedings, *Butz v. Economou*, 438 U.S. 478, 507-08 (1978).

¶16     We may address in any order the two steps of qualified immunity analysis — whether the officer's conduct violated a federal statutory or constitutional right and whether the right was clearly established at the time. *See al-Kidd*, 131 S. Ct. at 2080; *Pearson*, 555 U.S. at 236. Analyzing the first step, however, "is often beneficial" in that it "promotes the development of constitutional precedent." *Pearson*, 555 U.S. at 236; *see also Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011) (A "policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo."). To provide guidance for future cases, we first address whether the deputies violated Ochser's Fourth Amendment rights.

### C.  Fourth Amendment Violation

¶17     The Fourth Amendment not only requires probable cause for an arrest warrant, but also protects against "unreasonable searches and seizures." U.S. Const. amend. IV. All arrests,

9

either with or without a warrant, "must be reasonable under the circumstances." *al-Kidd*, 131 S. Ct. at 2080; *see Sodal v. Cook Cnty., Ill.*, 506 U.S. 56, 71 (1992) ("[R]easonableness is still the ultimate standard under the Fourth Amendment" (internal quotation marks omitted)).

¶18     It is undisputed that the warrant on which Ochser's arrest was made had been quashed.  A quashed warrant provides no valid constitutional basis for an arrest.  *See State v. Evans*, 177 Ariz. 201, 203, 866 P.2d 869, 871 (1994) (stating that an arrest made pursuant to a quashed warrant is "warrantless" and "plainly illegal," despite the arresting officer relying on an erroneous computer entry), *rev'd on other grounds*, 514 U.S. 1 (1995); *cf. Herring v. United States*, 555 U.S. 135, 139 (2009) (accepting parties' assumption of Fourth Amendment violation when arrest was based on recalled warrant, but noting that arrest "on reasonable but mistaken assumptions" does not necessarily result in "a constitutional violation").

¶19     In this civil action under § 1983, however, the threshold question is whether the deputies *themselves* acted unreasonably in arresting Ochser under the particular circumstances.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (explaining that first step of qualified-immunity analysis inquires whether "*the officer's conduct* violated a constitutional right" (emphasis added)).  Although the facial

10

validity of an arrest warrant will almost always demonstrate the reasonableness of an officer's actions in executing the warrant, facial validity alone is not automatically dispositive. Otherwise, an arrest pursuant to such a warrant would be "reasonable" even when the arresting officer has reliable, official information that the warrant in fact is invalid. We therefore reject the notion that an officer need never inquire further about the warrant's validity.

¶20    We recognize that arrestees often protest their innocence and claim the arrest warrant is either invalid or was issued for the wrong person. As the Supreme Court has stated, an officer "executing an arrest warrant is [not] required by the Constitution to investigate independently every claim of innocence." *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979). But neither may an officer unreasonably disregard readily accessible information indicating that the warrant is invalid.

¶21    On the facts of this case, viewed in the light most favorable to Ochser, we conclude that the deputies acted unreasonably under the Fourth Amendment by failing to retrieve the certified copy of the minute entry from Ochser's nearby office and conduct appropriate inquiry into the warrant's validity before arresting him. First, the conditions did not require an urgent arrest. The arrest warrant was issued sixteen months earlier and was based on an alleged failure to pay child

11

support, not a violent crime or circumstance posing an imminent public danger.

¶22    Second, retrieving the minute entry would not have jeopardized the deputies' safety. Unlike a situation where documentary evidence is allegedly inside a suspect's home or some potentially dangerous locale, the court order quashing the warrant was in the observatory, a workplace open to the public. And, perhaps most importantly, Deputy Funk in fact entered the building, making it all the more reasonable for him to retrieve the minute entry from Ochser's office.

¶23    Third, retrieval of the minute entry would not have involved significant dislocation or difficulty. Ochser's office was only twenty yards away from the place of arrest. When Deputy Funk entered the observatory, he was likely closer to Ochser's office than when he first confronted him. Given that the deputies had already spent two hours driving to Flagstaff, the brief time required to retrieve and examine the minute entry would not have been an unreasonable imposition.

¶24    Fourth, the defense expert testified that when officers are told an order quashing a warrant is easily at hand, good police practice requires the officers to retrieve the order. Given the procedural posture of this case, we accept as true Ochser's testimony that he told the deputies about the certified copy of the minute entry. Even though the deputies

12

claim he never mentioned the minute entry, Funk acknowledged that had Ochser brought it to his attention he would have gone to Ochser's office and investigated it. And had the deputies retrieved the minute entry, they likely would have determined that the arrest warrant was invalid. *See supra* ¶ 6.

¶25 We hold, and clearly establish prospectively, that when, as here, law enforcement officers arrest someone pursuant to a warrant and are confronted with readily available information that objectively casts genuine doubt on the warrant's validity, the officers must undertake further reasonable inquiry. Officers do not violate that standard, however, if further inquiry on the warrant's validity would be difficult, time-consuming, or would jeopardize officer safety. Moreover, the inquiry need only seek a determination of whether the warrant remains valid. It does not require officers to undertake the judicial function of determining whether the warrant should be invalidated.

### D.  Clearly Established Law

¶26 We now turn to the second step of the qualified-immunity analysis — whether the right was clearly established at the time of Ochser's arrest. An officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is

13

doing violates that right."   *al-Kidd*, 131 S. Ct. at 2083 (internal quotation marks and alterations omitted); *see also Saucier*, 533 U.S. at 202 (stating "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

¶27    The requirement that the right be clearly established "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," *al-Kidd*, 131 S. Ct. at 2085, and "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful," *Saucier*, 533 U.S. at 206.   Thus, "the right allegedly violated must be defined at [an] appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999).   In *al-Kidd*, the Supreme Court rejected the court of appeals' finding of "clearly established law lurking in the broad history and purposes of the Fourth Amendment" because "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."   131 S. Ct. at 2084 (internal quotation marks omitted); *see id.* ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."   (citations omitted)).   Only "in an

14

obvious case" may standards "cast at a high level of generality" constitute clearly established law. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

¶28 To determine whether a right was clearly established at the time of an officer's conduct, we "look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view." *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011); *see also Weatherford*, 206 Ariz. at 532-33 ¶¶ 8-9, 81 P.3d at 323-24 (in evaluating immunity claims in § 1983 actions, we look first to Supreme Court decisions and then may choose to follow Ninth Circuit authority that "has announced a clear rule" of law and that "appears just"). Although "[a] case directly on point" is not required, *al-Kidd*, 131 S. Ct. at 2083, and the facts of other cases need not be "materially similar" to the case at hand, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), "existing precedent must have placed the statutory or constitutional question beyond debate," *al-Kidd*, 131 S. Ct. at 2083. Stated differently, "in the light of pre-existing law[,] the unlawfulness must be apparent." *Hope*, 536 U.S. at 739.

¶29 Ochser relies heavily on *Berg v. County of Allegheny*, 219 F.3d 261, 267-68 (3d Cir. 2000), which considered qualified immunity for an officer who executed an arrest pursuant to a warrant mistakenly issued for the wrong person. A records clerk

accidently transposed two digits from a criminal complaint for a person named Banks, resulting in a warrant being generated for Berg, who had completed his parole three years earlier. *Id.* at 266. When a constable came to arrest him, Berg produced his release documents, but the constable refused to examine the paperwork. *Id.* at 267. The court found no probable cause for Berg's arrest and proceeded to analyze whether qualified immunity applied, stating "an apparently valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in light of the relevant circumstances." *Id.* at 273. The court explained that "[s]uch circumstances include, but are not limited to, other information that the officer possesses or to which he has reasonable access, and whether failing to make an immediate arrest creates a public threat or danger of flight." *Id.* The Third Circuit remanded the case to the district court for additional fact-finding to determine, as a matter of law, whether the constable's reliance on the warrant was unreasonable in light of the circumstances, including the fact that the constable was possibly predisposed to arrest because he earned a fee for each arrest. *Id.* at 273-74.

¶30 Ochser also relies on *Peña-Borrero v. Estremeda*, 365 F.3d 7, 10 (1st Cir. 2004), in which a man not only informed his arresting officers that the warrant they held had already been executed, but also produced a copy of an identical arrest

16

warrant bearing a stamp that showed prior execution. Calling the stamped warrant "unequivocal documentary evidence," the First Circuit concluded a jury could find that the officers acted unreasonably in making the arrest. *Id.* at 11, 13. The court explained that a failure to seek additional verification in the face of the stamped warrant "reflected a much more deliberate disregard for whether the warrant remained valid." *Id.* at 13. Emphasizing the importance of reasonable verification, the court noted that "[i]f any doubts remained after appellant displayed the stamped warrant, a quick phone call to the precinct presumably would have resolved them." *Id.*

¶31 *Berg* and *Peña-Borrero* are analogous to this case and support our conclusion that the deputies' conduct here was unreasonable. Like *Berg*, this case involves readily accessible documentation that called the warrant's validity into question. And in those cases, as here, the officers did not face safety concerns or have an urgent need to immediately arrest.

¶32 But the court in *Berg* did not actually decide the issue of reasonableness, and the constable's possible predisposition to arrest complicated the reasonableness analysis. And because the officers in *Peña-Borrero* retrieved the proffered documents from the arrestee's trunk, the First Circuit had no need to address whether the officers would have been unreasonable had they not done so. *Peña-Borrero*, 365 F.3d

17

at 10. Rather, *Peña-Borrero* turned on the officers' failure to undertake reasonable verification after an inspection of the documents revealed the substantial likelihood that the warrant was already executed.

¶33 Nonetheless, the Fourth Amendment requires that an arrest "be reasonable *under the circumstances*." *al-Kidd*, 131 S. Ct. at 2080 (emphasis added). Courts have explained that relevant circumstances include whether the officer knew or should have known that the warrant had been quashed. *See Torres Ramirez v. Bermudez Garcia*, 898 F.2d 224, 226, 228 (1st Cir. 1990) (rejecting summary judgment in a vacated-warrant case when entry in officer's log book and notations on the warrant itself could allow a jury to conclude the officer knew or should have known the warrant had been quashed); *see also Martin v. Russell*, 563 F.3d 683, 685 (8th Cir. 2009) (stating, without deciding, that "[i]f [an arrest warrant] was vacated and the officers knew or should have known that it was, then the arrests would have been unconstitutional under the Fourth Amendment because they would have been unwarranted and unreasonable"). Courts have also considered whether an officer knew that the law enforcement agency's warrant database was unreliable. *See McMurry v. Sheahan*, 927 F. Supp. 1082, 1090-91 (N.D. Ill. 1996) (concluding an arrest was unreasonable when the arrestee repeatedly protested the arrest warrant was previously quashed and the

18

arresting officer should have known his computer check was unreliable because the warrant database was known to be an utter failure).

¶34      The law as a whole at the time of Ochser's arrest in May 2004, however, did not clearly establish the unconstitutionality of the deputies' actions. No opinions of the United States Supreme Court are closely on point. In *Baker*, a man assumed his brother's identity on bail release. 443 U.S. at 140-41. When the man failed to return, a warrant was issued in the brother's name for the man's arrest. *Id.* at 141. Officers arrested the brother, despite his claims of mistaken identification, and the brother was detained for several days. *Id.* The Supreme Court rejected the brother's § 1983 due process claim. *Id.* at 144-45. The Court explained that "[t]he Constitution does not guarantee that only the guilty will be arrested" and that it did "not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence." *Id.* at 145-46.

¶35      *Baker* did not involve a quashed warrant. Several federal courts, however, have extended *Baker*'s reasoning to the quashed-warrant context. In rejecting a woman's claim that her arrest violated due process when she protested to the arresting officers that her warrant had been quashed, the Fourth Circuit relied on the facial validity of the warrant and *Baker*'s

19

guidance that an officer need not "investigate independently every claim of innocence." *Mitchell v. Aluisi*, 872 F.2d 577, 578-79 (4th Cir. 1989). The Tenth Circuit similarly concluded that an arresting officer need not check the arrest warrant when requested to do so, because "[u]nless a warrant is facially invalid an officer has no constitutional duty to independently determine its validity." *Hill v. Bogans*, 735 F.2d 391, 393 (10th Cir. 1984). Relying on *Mitchell*, a district court considering an arrest pursuant to a canceled warrant found it "well established that when an arrest and subsequent detention are undertaken pursuant to a facially valid warrant, there is no violation of the Fourth Amendment." *Peacock v. Mayor & City Council of Baltimore*, 199 F. Supp. 2d 306, 309 (D. Md. 2002).

¶36 Other courts, in contrast, have distinguished *Baker* in the quashed-warrant context. In a case involving a woman arrested pursuant to a warrant in the face of her protests that the warrant had been recalled, the Seventh Circuit stated that "[i]t seems clear" the woman "sustained a violation of constitutional rights by being arrested and detained pursuant to an invalid warrant." *Murray v. City of Chicago*, 634 F.2d 365, 366 (7th Cir. 1980); *see also Wilson v. City of Boston*, 421 F.3d 45, 57 (1st Cir. 2005) (finding it "well established in other federal courts . . . that an arrest made on the basis of a facially valid warrant which turns out to have been cleared

20

before the arrest violates the Fourth Amendment").

¶37     These two lines of cases, however, involved arrestees who baldly asserted, without supporting documentation, that their arrest warrants were invalid. They are therefore not particularly helpful in determining whether an arresting officer's actions are reasonable in the face of a serious, provable challenge to a warrant's validity.

¶38     More pertinent to our analysis, however, is *Lauer v. Dahlberg*, 717 F. Supp. 612 (N.D. Ill. 1989), *aff'd*, 907 F.2d 152 (7th Cir. 1990). There, an arrest warrant had been quashed the day before the arrest was made, but that information had not yet been disseminated. *Id.* at 613. The arrestee proffered to the arresting officer an uncertified copy of the warrant recall order. *Id.* at 614. The court rejected the notion that officers need "to investigate further than confirming the active status of the warrant over the police radio." *Id.* "To hold otherwise," the court stated, "would be to place impossible burdens upon police officers. Judgments as to authenticity of recall orders, which like all other documents are subject to error, alteration, and forgery, are ordinarily best made in the station house or the courthouse, rather than by a police officer in the field." *Id.*

¶39     Unlike *Lauer*, this case involves a certified copy of the court order quashing the warrant. Although certified copies

21

provide significant intrinsic assurances of authenticity, the concerns of alteration and forgery expressed in *Lauer* nonetheless extend to certified copies, particularly when proffered by an arrestee. *Lauer* and *Peña-Borrero* could thus reasonably be read as merely requiring officers to make "a quick phone call to the precinct" to verify. *Peña-Borrero*, 365 F.3d at 13.

¶40     Given the conflicting case law at the time of Ochser's arrest in May 2004, we cannot conclude that "every reasonable official would have understood" that the deputies' conduct here was unreasonable and violated Ochser's Fourth Amendment rights. *al-Kidd*, 131 S. Ct. at 2083 (internal quotation marks omitted); *see also Saucier*, 533 U.S. at 202. The existing precedent did not place the question of reasonableness under these circumstances "beyond debate." *al-Kidd*, 131 S. Ct. at 2083. Accordingly, the deputies are entitled to qualified immunity as a matter of law.

### III.  DISPOSITION

¶41     The trial court's grant of summary judgment in favor of Deputies Funk and Cruz is affirmed, and the court of appeals' opinion is vacated.

_____
A. John Pelander, Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Andrew D. Hurwitz, Vice Chief Justice


_____
W. Scott Bales, Justice


_____
Robert M. Brutinel, Justice