NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

HARIANTO HARIANTO, et al., *Plaintiffs/Appellants*,

*v.*

STATE OF ARIZONA, et al., *Defendants/Appellees*.

No. 1 CA-CV 18-0446
FILED 6-15-2021

Appeal from the Superior Court in Maricopa County
No. CV 2015-051925
The Honorable John R. Hannah, Jr., Judge

**AFFIRMED IN PART; VACATED AND REMANDED IN PART**

COUNSEL

Zachar Law Firm, Phoenix
By Christopher J. Zachar
*Co-Counsel for Plaintiffs/Appellants*

The Leader Law Firm PC, Tucson
By John P. Leader
*Co-Counsel for Plaintiffs/Appellants*

Ahwatukee Legal Office PC, Phoenix
By David L. Abney
*Co-Counsel for Plaintiffs/Appellants*

Arizona Attorney General's Office, Phoenix
By G. Michael Tryon
*Co-Counsel for Defendants/Appellees*

Fennemore Craig PC, Phoenix
By Douglas C. Northup, Philip L. Brailsford, Jennifer L. Clyde
*Co-Counsel for Defendants/Appellees*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Lawrence F. Winthrop joined.

---

**B R O W N**, Judge:

**¶1**        Appellant Harianto Harianto and several of his family members (collectively, "Harianto") were involved in a head-on collision with a wrong-way driver on I-17 near mile post 248 in Yavapai County. Harianto filed suit against the State of Arizona ("the State"), alleging the Arizona Department of Transportation ("ADOT") and the Department of Public Safety ("DPS") were negligent. The superior court granted summary judgment in favor of the State on all claims. For the following reasons, we affirm in part, vacate in part, and remand for further proceedings.

**BACKGROUND**

**¶2**        The relevant facts are undisputed. Alan Horan ("Horan") was spotted before dawn on May 16, 2014, driving north in the southbound lanes of I-17 in northern Maricopa County. Southbound motorists began calling 911 at 4:05 a.m. Callers described Horan as driving lock-armed, staring straight ahead as if in a trance, and unaware of the hazard he was creating.

**¶3**        Because Horan was in Maricopa County when the first calls were received, they were routed to the Metro West district, which extends north to the southern boundary of Yavapai County. While receiving the calls, Dispatcher Zeiher, a DPS employee working in that district, alerted law enforcement officers to respond to the "wrong-way" driver emergency,

2

which was automatically classified as the "highest priority-type call."[1] During the emergency, officers responded to the alerts at various times and locations. DPS Sergeant Sharp was near Anthem when the call was dispatched about a wrong-way driver. Sharp immediately attempted to intercept Horan, first at Anthem Way and then Table Mesa Road, but was unsuccessful. He continued driving north to further respond to the emergency.

¶4    As Horan approached the boundary between Maricopa and Yavapai counties, Zeiher contacted the Flagstaff dispatch office, which in turn notified DPS troopers in Yavapai County about Horan. At 4:22 a.m., Trooper Schmidt was driving south on I-17 at mile post 255 when he received the call about Horan from Flagstaff dispatch. Schmidt initiated a traffic break to slow and eventually stop the southbound traffic with the goal of preventing southbound motorists from colliding with Horan's vehicle. Once the traffic was stopped, Schmidt intended to use his patrol car as a barrier between Horan and the southbound motorists.

¶5    At around 4:27 a.m., however, a few miles south of where Schmidt had started the traffic break, Horan's car collided head on with Harianto's minivan, killing three passengers in the minivan and seriously injuring another two passengers and the drivers of both vehicles. Horan had traveled at least 21 miles on I-17 in the wrong direction before the collision. Police could not determine exactly how, when, or why Horan began driving the wrong direction, but investigators speculated he was experiencing medical issues.

¶6    Harianto sued the State, alleging that through its agencies, the State was negligent in (1) failing to take appropriate measures, including providing reasonable warnings to prevent wrong-way driving and related accidents, and (2) failing to adopt or implement any law enforcement standards to prevent such accidents. Harianto also alleged the State knew or should have known that wrong-way incursions were occurring on a

---

[1]    While Harianto at times mentions "dispatchers," his briefing focuses almost exclusively on the alleged negligence of Zeiher, who was primarily responsible for alerting law enforcement officers about the wrong-way driver. Thus, although the record suggests several other dispatchers assisted in handling the emergency, we do not specifically address them in our analysis. The involvement of the other dispatchers is only relevant to the extent the record shows they may have been grossly negligent.

regular basis on Arizona's highways and that fatal collisions caused by wrong-way drivers had been increasing in recent years.

¶7          Following substantial discovery, the State moved for summary judgment, arguing (1) absolute immunity barred Harianto's allegation that the State was negligent for failing to adopt wrong-way driver policies, and (2) statutory qualified immunity precluded the alleged negligence claim related to DPS's response. The State also asserted that regardless of immunity, Harianto failed to establish an applicable standard of care, breach, or causation. Harianto countered in part that DPS was subject to liability based on Schmidt's response to the Horan emergency.

¶8          The superior court granted the State's motion, finding the State had statutory qualified immunity for the alleged negligent decisions DPS personnel made "concerning interdiction of [Horan] on the day of the collision." Harianto moved for reconsideration, asserting (1) no qualified immunity exists for 911 dispatcher negligence claims, and (2) summary judgment was improper, because if the dispatchers had contacted field officers sooner, they would have likely prevented the collision. The court denied the motion and this timely appeal followed.

¶9          Originally we issued a memorandum decision affirming summary judgment on the alleged negligence of ADOT and DPS officers. In a separate opinion, we held that Harianto's claims against the DPS dispatchers for negligently mishandling the emergency calls were precluded based on statutory qualified immunity, A.R.S. § 12-820.02(A)(1). Harianto petitioned for review in the supreme court. Addressing dispatcher liability, in its response the State asserted for the first time that Harianto's claims against DPS dispatchers were also precluded by A.R.S. § 12-713. The supreme court granted review, vacated the opinion, and directed us to reconsider our decision in light of that statute. We issued an order withdrawing the memorandum decision and the opinion, and we directed the parties to submit supplemental briefing addressing A.R.S. § 12-713.

## DISCUSSION

¶10        We review the superior court's grant of summary judgment de novo, viewing the evidence and reasonable inferences in the light most favorable to the non-moving party. *Ochser v. Funk*, 228 Ariz. 365, 369, ¶ 11 (2011). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). We will affirm the court's disposition

if we conclude it is correct for any reason. *Hawkins v. State Dep't of Econ. Sec.*, 183 Ariz. 100, 103 (App. 1995).

### A.      Causation—ADOT

**¶11**      Harianto argues the superior court erred in granting summary judgment because the State, through ADOT, was negligent in failing to adopt wrong-way driver prevention measures, and its failure to adopt such measures was a cause of the accident. To establish a claim of negligence against ADOT based on its lack of policies and procedures, Harianto was required to show: (1) the existence of a duty that required conformity to a certain standard of care, (2) breach of that duty, (3) a causal connection between the breach and injury, and (4) actual damages. *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9 (2007). Although not specifically addressed by the superior court, we conclude on this record that causation is lacking and thus we do not address the remaining elements of negligence.

**¶12**      Causation has two subparts: (1) actual or factual causation, and (2) proximate or legal causation. *Dupray v. JAI Dining Servs. (Phoenix), Inc.*, 245 Ariz. 578, 583, ¶ 17 (App. 2018). Actual causation "exists if the defendant's act helped cause the final result and if that result would not have happened without the defendant's act." *Ontiveros v. Borak*, 136 Ariz. 500, 505 (1983). This is true even if the negligent act contributed "only a little" to the injury. *Id.* Proximate causation exists when the defendant's acts are a "substantial factor" in the injury. *Barrett v. Harris*, 207 Ariz. 374, 381, ¶ 26 (App. 2004). If the substantial factor test is met, actual causation is sufficient to establish proximate cause unless an extraordinary unforeseeable intervening event occurs. *Dupray*, 245 Ariz. at 583, ¶ 17. Thus, the "proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546 (1990) (citation omitted).

**¶13**      Proximate cause is usually a jury question. *McMurty v. Weatherford Hotel, Inc.*, 231 Ariz. 244, 256, ¶ 38 (App. 2013). However, "[s]heer speculation is insufficient to establish the necessary element of proximate cause or to defeat summary judgment." *Badia v. City of Casa Grande*, 195 Ariz. 349, 357, ¶ 29 (App. 1999). This is especially so if parties rely on conjectural or conclusory expert opinions. *See id.* at ¶ 30.

**¶14**      For example, in *Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix*, 216 Ariz. 454 (App. 2007), the plaintiff was abducted from a city

bus stop and sexually assaulted. *Id*. at 456, ¶ 2. Plaintiff sued on the theory that the city negligently failed to provide protective shelter and proper lighting at the bus stop. *Id*. at 459, ¶ 15. The plaintiff's expert opined that if the city had taken such action, the plaintiff would not have been abducted. *Id*. at 461, ¶ 25. We rejected this opinion as speculative, finding "no basis in the facts" to infer that the plaintiff's injuries could have been prevented by such measures. *Id*. at ¶ 26. We therefore affirmed the superior court's grant of summary judgment to the city. *Id*. at 456, ¶ 1.

¶15 Harianto submitted expert opinion evidence from Dr. Robert Bleyl ("Bleyl"), a traffic engineer, who asserted that if ADOT would have undertaken more robust wrong-way driver mitigation efforts, it is likely the accident would have been avoided. Bleyl, however, did not base his opinion on the facts and circumstances of this case, but rather on conclusions drawn from general statistics and evidence from other states, particularly California. He opined that because California had adopted wrong-way countermeasures and experienced a decrease in the number of wrong-way driving incidents, then the same would likely be true in Arizona. Bleyl did not analyze any particular stretch of roadway connected with the accident in evaluating whether ADOT was liable. Indeed, nothing in Bleyl's testimony indicates that Horan could have been stopped by warning signs or other measures because it is unclear how, why, or where Horan began driving the wrong direction. It is also unclear whether Horan was even lucid during the incident and capable of understanding and complying with any such warnings. Bleyl's unsupported opinion does not provide any reasonable basis to infer that Horan entered the roadway and drove the wrong way because the State failed to adopt and implement further measures to prevent wrong-way driving in general.

¶16 In sum, Bleyl's testimony is merely speculative and therefore legally insufficient to create a material question of fact as to whether ADOT's efforts, or the lack thereof, were a substantial factor in causing Harianto's injuries. *See Grafitti*, 216 Ariz. at 460, ¶¶ 20–21; *Shaner v. Tucson Airport Auth., Inc.*, 117 Ariz. 444, 447–48 (App. 1997) (finding that when causation was based on a chain of inferences only, "the jury would be left to sheer speculation on the issue"); *cf. Badia*, 195 Ariz. at 357, ¶¶ 29–30 ("Expert opinions, without more, do not necessarily render a plaintiff's allegations of gross negligence triable issues of fact. That is particularly so when, as here, the expert's opinions on the issues of . . . causation are largely conjectural and conclusory."). A reasonable jury could not infer that ADOT's actions were the cause of the accident. Accordingly, we need not address whether Horan's driving was a superseding cause that would also relieve the State of liability. *See Grafitti*, 216 Ariz. at 462, ¶ 29.

**¶17** The superior court properly granted summary judgment on Harianto's claim that ADOT was negligent in failing to take reasonable measures to prevent wrong-way driving accidents.[2]

### B. Statutory Qualified Immunity—DPS Dispatchers

**¶18** Questions of statutory interpretation, including the applicability of qualified immunity, are subject to this court's de novo review. *Smyser v. City of Peoria*, 215 Ariz. 428, 432, ¶ 8 (App. 2007). Judicial construction of governmental immunity statutes "should be restrained and narrow." *Fidelity Sec. Life Ins. Co. v. State, Dep't of Ins.*, 191 Ariz. 222, 225, ¶ 7 (1998). Thus, governmental liability is presumed unless an exception clearly applies. *See Doe ex rel. Doe v. State*, 200 Ariz. 174, 176, ¶ 4 (2001).

**¶19** Implicitly relying on A.R.S. § 12-820.02(A)(1), the superior court denied Harianto's claim that the 911 dispatchers were negligent. In his original briefing on appeal, Harianto argued that qualified immunity under § 12-820.02(A)(1) does not apply to a dispatcher under any circumstances, and because Dispatcher Zeiher delayed in contacting the Flagstaff district, she was negligent, making the State liable. Harianto's argument was based on *Hutcherson v. City of Phoenix* (*Hutcherson I*), 188 Ariz. 183 (App. 1996), *vacated*, 192 Ariz. 51 (1998), which held that § 12-820.02 "does not grant qualified immunity to 911 operators." *Hutcherson I*, 188 Ariz. at 190. That holding, however, has been superseded by § 12-713, which at the time of the accident provided as follows:

> A person, private entity or public entity or any of its employees that is involved in developing, operating, implementing, maintaining or participating in a 911 emergency telephone system or similar emergency dispatch system or a public safety radio communications network or similar network is not liable for civil damages that result from an act or omission in connection with developing, operating,

---

[2] Because Harianto failed to establish causation relating to ADOT's alleged negligence, we need not address whether absolute immunity under A.R.S. § 12-820.01(A)(2) bars that claim. To the extent Harianto appeals the superior court's determination that absolute immunity applied to DPS for its wrong-way prevention policies and procedures, that argument is waived. Although the argument is briefly mentioned in Harianto's opening brief, it is not developed. *See* ARCAP 13(a)(7). More importantly, the reply brief confirms that Harianto "do[es] not, in this appeal, challenge DPS's failure to have specific wrong way driving policies/procedures."

implementing, maintaining or participating in a 911 emergency telephone system or public safety radio communications network or a similar emergency system or network *unless the person or entity acted knowingly or had reason to know the facts that would lead a reasonable person to realize that the person's or entity's act or failure to act not only created an unreasonable risk of bodily injury to others, but also involved a high probability that substantial harm would result.*

A.R.S. § 12-713 (2014) (emphasis added).[3]

**¶20**        The State argues that § 12-820.02(A)(1) applies regardless of § 12-713.  But our supreme court directed us to reconsider our decision in light of § 12-713.  The issue before us, then, is whether Harianto's negligence claims against DPS relating to Zeiher are precluded by § 12-713, and whether he can establish triable issues of fact that Zeiher was grossly negligent.

**¶21**        Harianto does not dispute that A.R.S. § 12-713 precludes any claim that DPS or its dispatchers were negligent in handling the 911 calls leading up to the accident.  Instead, to overcome the presumption of statutory immunity, Harianto is required to present evidence showing Zeiher was grossly negligent in her handling of the emergency.  *See Walls v. Ariz. Dept. of Pub. Safety*, 170 Ariz. 591, 595 (App. 1991).

**¶22**        To establish gross negligence, a plaintiff must first prove the four elements of ordinary negligence: duty, breach, causation, and damages.  *See Gipson*, 214 Ariz. at 143, ¶ 9.  To establish gross (or "wanton") negligence, a plaintiff must also show the defendant knew or had reason to know that an action or lack thereof "would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result."  *Walls*, 170 Ariz. at 595.

**¶23**        The definition of gross negligence "is, at best, inexact." *Weatherford ex rel. Michael L. v. State*, 206 Ariz. 529, 535 n.4 (2003).

---

[3]        The parties agree this version of the statute applies here.  In 2015, the legislature amended A.R.S. § 12-713.  2015 Ariz. Sess. Laws, ch. 239, § 2 (1st Reg. Sess.) (H.B. 2205).  Though still consistent with the version in effect at the time of the accident, the 2015 version states that the presumption of immunity may be overcome only upon a showing of "wanton or wilful misconduct."  *Id.*

"[N]egligence suggests a failure to measure up to the conduct of a reasonable person." *Id*. (internal quotation marks and citations omitted). In contrast, gross negligence "generally signifies more than ordinary inadvertence or inattention, but less perhaps than conscious indifference to the consequences, which falls closer to the recklessness standard that usually involves a conscious disregard of a risk." *Noriega v. Town of Miami*, 243 Ariz. 320, 328, ¶ 36 (App. 2017) (internal quotation marks and citations omitted).

¶24        Generally, whether gross negligence occurred is a question of fact for a jury to determine. *Id*. at 329, ¶ 37. "In order to present such an issue to the jury, gross negligence need not be established conclusively, but the evidence on the issue must be more than slight and may not border on conjecture." *Walls*, 170 Ariz. at 595. Summary judgment is appropriate if "no evidence is introduced that would lead a reasonable person to find gross negligence." *Id*.

¶25        Initially, Harianto's liability claim against DPS centered on whether Schmidt was grossly negligent, which we address below. *Infra* ¶¶ 33–35. Much later in the litigation, Harianto alleged DPS was negligent due to Dispatcher Zeiher's negligent acts or omissions. Harianto supported the allegation with the opinions of Rob Robinson, a police practices expert.

¶26        In his deposition, which was taken before Schmidt or Zeiher were deposed, Robinson explained:

> [I]n listening to the dispatch tapes, I noticed neither the dispatcher nor Sergeant Sharp ever made any mention to contact officers located north, in the Cordes Junction, in the Sunset Point, maybe Prescott Valley, I believe Mayer is right there — isn't Mayer right next or just before Prescott Valley, right at the freeway — to see if there are any officers up there that could have start heading south or conduct a traffic break.
>
> I think if they would have — it's 14 miles from Cordes Junction down to Sunset Point.
>
> So the pursuit — or the incident lasted . . . 30 miles.
>
> So let's just say he was doing about 60 miles an hour, which was about what most people were reporting, 50 to 55.
>
> Basically they had 16 minutes, and I'm just doing very rough math, 16 minutes of time to get a hold of the officer, have him

have enough time to be prepared to get into his car or do what he does before he gets in his car, and then proceed to [I-]17 to conduct a traffic break.

I don't know what that time frame was in as much as how long they took to notify the officer up in Cordes Junction, but I . . . can't assume. That will be up to you guys to do the math on that. But I think that's a question that would need to be answered to see exactly what the procedure was and if there was a policy for calling ahead, especially to a . . . resident officer, north of Table Mesa, north of Sunset Point.

¶27        In his supplemental declaration, Robinson opined in part:

54. Police dispatchers are emergency communications professionals who are called upon to ensure the successful transmission of information from callers to responding police personnel. Their work involves providing accurate and timely information to police officers and dispatching the appropriate personnel to incidents and emergencies through a two-way communications system within a city or municipal police department.

55. At no time during this incident did the dispatchers attempt to coordinate or direct the responding police officers' response. Instead, they simply let the officers respond to locations as they chose creating a "hit and miss" strategy. Using a "hit and miss" strategy to capture a WWD certainly does not fall within accepted law enforcement policy, procedure and practice, and does nothing but create chaos and uncertainty for those officers involved. It also places the community at risk since there are no set of guidelines or plan to follow to ensure avenues of escape are covered, traffic is stopped at intersections, arrest and cover teams are assigned, perimeters are established. It is imperative for dispatchers to be trained and have policy on how to direct DPS officers to terminate a WWD. Without this leadership and direction, DPS officers simply responded in an uncontrolled and chaotic manner placing others at risk of death or serious injury to others.

56. During her deposition, DPS Police Call Taker Nancy Jo Zeiher (who was a dispatcher until summer of 2017) could not

recall receiving any type of training how to direct officers during WWD incidents.

57. It is a matter of record that the DPS WWD Committee recommended in 2013 that DPS implement a general order and specific training for its officers regarding wrong-way drivers. It is reasonable that such training would incorporate the countermeasures spelled out in the Report SIR-12/01/15. Had WWD training been in place, responding DPS officers would have been aware of opportunities to terminate this WWD with very little opportunity of injury to others. They include:

1. Although former dispatcher Nancy Jo Zeiher testified appropriately that wrong-way drivers are a priority, (Zeiher p. 22 at 18-20; p. 23 at 4-5), she also testified that in this instance, she:

a. Did not determine where available officers were located; (p. 82 at 6-15)

b. Did not establish or monitor communications with the officers that were located; (p. 68 at 19 – p. 69 at 11; p. 71 at 8-13), and

c. Did not coordinate the responses among and between the officers that were located. (p. 73 at 15 – p. 74 at 6; p. 74 at 23 – p. 75 at 14.)

2. Contact with Officer Schmidt: Officer Schmidt was notified of the wrong-way driver by dispatch at 4:22 a.m. The collision occurred at 4:27 a.m. If he had been timely notified, when dispatch first learned of the wrong-way driver at 4:05 a.m., Officer Schmidt would have had 17 minutes (or more) in which to set up a traffic break, stop sticks, or other measures to either stop Horan or to stop and thus protect southbound traffic. Unfortunately, DPS had no policies on notification of adjacent dispatch areas.

¶28    Whether Zeiher was grossly negligent in her handling of the dispatch calls was not presented to the superior court. As noted by Harianto in his supplemental brief, in the superior court and on appeal before the supreme court's remand order, the parties, the superior court, and this court focused on whether *Hutcherson I* was applicable; A.R.S. § 12-

713 was never addressed. The State contends it had no reason to raise § 12-713 in the superior court as an immunity defense. We disagree. As the State acknowledges in its answering brief, the State was alerted no later than September 2017 that Harianto had alleged Zeiher was negligent in handling the emergency calls. The superior court issued its summary judgment ruling in May 2018. If the State had raised § 12-713 within a reasonable time after learning of Harianto's theory that Zeiher was negligent, the only viable issue remaining would have been whether she was grossly negligent.

**¶29** Instead, because Harianto took the position that *Hutcherson I* concluded there was no statutory qualified immunity for a dispatcher, only simple negligence was at issue to determine whether the State could be held liable for Zeiher's acts or omissions. In reality, however, the legislature adopted § 12-713 the following year after *Hutcherson I* was decided. But that does not change the fact that the State did not mention § 12-713 until it filed its response to Harianto's petition for review in the supreme court.

**¶30** The State also makes the point that Harianto never alleged a gross negligence claim in the superior court. But he was not required to allege gross negligence under § 12-713 unless the State asserted that his claim was precluded by that statute. *See Allen v. Town of Prescott Valley*, 244 Ariz. 288, 292, ¶ 14 (App. 2018) (rejecting town's contention that plaintiff waived his right to recover under a gross negligence theory by not alleging it in his complaint or referencing it in his disclosure statement because "the issue of qualified immunity under § 33–1551 was not implicated until the Town asserted it in its answer"). Unlike Harianto's claim that DPS was grossly negligent based on Schmidt's conduct, which the State placed at issue in the summary judgment proceedings, Harianto's claim relating to Zeiher was based solely on negligence.

**¶31** The State further contends that Harianto cannot establish the standard of care or prove causation. At this stage of the litigation, and because the superior court has not addressed these issues, we cannot conclude as a matter of law that Zeiher was not grossly negligent. These matters, and the scope of any additional proceedings to evaluate the State's immunity defense under § 12-713, must be addressed on remand.[4] And to

---

[4] The State moved to exclude Robinson from testifying as an expert witness, asserting in part untimely disclosure and inadmissibility of his opinions under Arizona Rule of Evidence 702. The superior court denied the State's motion. The State also moved to strike Robinson's supplemental declaration, asserting there was no good cause for his untimely filing. In its

the extent Harianto claims DPS was negligent in failing to train its dispatchers, that claim is precluded by § 12-713 unless he can show DPS's inaction was grossly negligent.

¶32 Given this unique procedural posture, we conclude the case must be remanded to allow the superior court to determine in the first instance whether Harianto can establish that either DPS personnel (due to lack of training) or Zeiher knew or had reason to know that their acts or omissions would lead a reasonable person to realize his or her conduct created an unreasonable risk of bodily harm to others and involved a high probability that substantial harm would result. *See* A.R.S. § 12-713; *Walls*, 170 Ariz. at 595. In doing so, we express no opinion whether Harianto can meet that burden.

## C. Statutory Qualified Immunity—DPS Officers

¶33 The superior court found that qualified immunity under A.R.S. § 12-820.02 precluded Harianto's claims that the DPS officers involved in the wrong-way emergency were negligent. Section 12-820.02 states:

> A. Unless a public employee acting within the scope of the public employee's employment intended to cause injury or was grossly negligent, neither a public entity nor a public employee is liable for:
>
> 1. The failure to make an arrest or the failure to retain an arrested person in custody.

As previously determined by this court, "failure to make an arrest" includes the "failure to make an investigatory stop which may or may not lead to an arrest." *Walls*, 170 Ariz. at 595.

¶34 Despite the availability of statutory qualified immunity, public employees are not shielded from liability if their actions are intended to cause injury or are grossly negligent. A.R.S. § 12-820.02(A). Harianto does not challenge the superior court's ruling that qualified immunity applies to the actions of the individual DPS officers in responding to the wrong-way emergency under *Walls*. Instead, Harianto argues qualified immunity does not apply here because Trooper Schmidt was grossly negligent in responding to the Harianto accident. We are not persuaded

summary judgment ruling, the court assumed Robinson's expert opinions were admissible and denied the motion to strike as moot.

any genuine disputes of material fact exist as to whether Schmidt was grossly negligent.

¶35 Harianto argues that if Schmidt had sped towards the wrong-way driver, rather than immediately initiating a traffic break, the accident would not have occurred. The record indicates that when Schmidt received the call at 4:22 a.m. regarding Horan's wrong-way driving, he began initiating a traffic break in compliance with DPS's Highway Operations Manual. He formulated a plan to create a roadblock with his patrol car to stop Horan once the traffic break was complete. Nothing about Schmidt's response suggests gross negligence, particularly when the accident occurred about five minutes after he was notified of the emergency. The superior court did not err in concluding the evidence cannot support a finding that DPS officers were grossly negligent.

## CONCLUSION

¶36 We conclude as a matter of law that Harianto failed to establish that (1) ADOT's alleged negligence proximately caused the injuries suffered by the occupants in the minivan, and (2) the alleged operational negligence of DPS officers is precluded under A.R.S. § 12-820.02(A). We therefore affirm dismissal of those claims. We vacate, however, the portion of the court's order addressing the alleged operational negligence of DPS dispatchers and remand for reconsideration of whether Harianto can prove the dispatchers were grossly negligent under A.R.S. § 12-713.



AMY M. WOOD • Clerk of the Court
FILED:   AA