NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

METRO AUTO AUCTION, LLC, *Plaintiff/Appellee*,

*v.*

VERDONE MOTORS, LLC, et al., *Defendants/Appellants*.

No. 1 CA-CV 22-0227
FILED 2-28-2023

---

Appeal from the Superior Court in Maricopa County
No. CV2019-052714
The Honorable Sara J. Agne, Judge

**AFFIRMED IN PART; VACATED AND REMANDED IN PART**

---

COUNSEL

Munger Chadwick & Denker PLC, Tucson
By Thomas A. Denker, David Ruiz, John G. Anderson
*Counsel for Defendants/Appellants*

Clark Hill PLC, Scottsdale
By Darrell E. Davis, Christopher Thomas Curran
*Counsel for Plaintiff/Appellee*

---

## MEMORANDUM DECISION

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Michael S. Catlett joined.

---

**B R O W N**, Judge:

¶1        Verdone Motors, LLC ("VM"), Armand Verdone Jr. ("Verdone"), and Shiree Verdone (collectively, "Defendants"), appeal the superior court's order granting summary judgment in favor of Metro Auto Auction, LLC, ("Metro") on Metro's claims for breach of contract and violations of the bad check and civil racketeering statutes.  We affirm the court's ruling on the breach of contract claim and the related damages award.  We vacate, however, the court's judgment on the statutory claims and remand for further proceedings.

## BACKGROUND

¶2        Metro is a licensed automotive auction that permits authorized brokers to buy and sell cars at its auction facilities.  VM is a licensed wholesale car dealer, with Verdone as its sole member and manager.  In 2016, VM started participating in Metro's auction.  Under Metro's terms and conditions ("Contract"), VM agreed that (1) all transactions must be "paid for on the day of sale;" (2) upon issuance of the check, or when presented for payment, there would be sufficient funds to cover it; and (3) any checks returned for insufficient funds "must be settled and replaced immediately with cash or certified funds to prevent collection action."  Verdone signed a personal guaranty, agreeing to undertake personal liability for performance of the Contract.

¶3        Between 2016 and 2019, VM often used Metro's auction facility to buy and sell cars.  During their business dealings, they often handled transactions less formally than called for in their contractual arrangement, partly because Verdone had worked for a Metro affiliate for years.  The informalities between the parties facilitated their dealings and generated greater profits.  For example, when Metro was pressed to meet required sales targets, Metro's owners instructed Verdone to buy a certain number of cars to help meet those targets.  Because VM did not have adequate working capital to cover the purchases on its own, and despite the Contract, Metro credited VM's account with the bid amount for each car

and paid the seller directly to facilitate the large volume of transactions. VM, in turn, reimbursed Metro by writing checks for each car purchase, often after VM had proceeded to sell the acquired cars through the auction to other buyers. These checks were often "hold checks," meaning checks that Metro agreed not to deposit until it received further authorization from Verdone. Alternatively, the checks were sometimes replaced with a cashier's check or by a wire transfer. This arrangement allowed Metro to earn double profits because it earned auction fees on VM's car purchases and again on VM's sale of the same cars through its auction.

¶4 Metro supported VM in other ways. For instance, VM hired several of Metro's employees as its support staff, paying individuals to conduct its banking and related business matters. One of the employees handled VM's checkbook and had authority to write checks pre-signed by Verdone as needed to complete transactions throughout the business day. And despite being aware of VM's lack of capital, Metro encouraged and facilitated VM's transactions at its auction because VM had become Metro's largest customer by a substantial margin, buying and selling roughly 4,200 cars through the auction in 2018.

¶5 Between December 4, 2018, and January 29, 2019, VM bought 59 cars through Metro's auction. Verdone had signed checks for the purchase price of each car, but each check was returned for insufficient funds because the corresponding accounts were frozen, blocked, or closed. The first check returned, because the account was on an uncollectible hold, was deposited on January 15, 2019. On January 25, Metro received notice that 16 more checks had been returned for the same reason. Metro received additional notices that checks had been returned on January 28 and 29. Between January 30 and February 11, VM paid Metro $536,048 through "replacement checks or transferred vehicle titles that Metro eventually sold." On February 12, Verdone informed Metro that VM would no longer buy or sell cars through the auction. On the same day, 34 additional checks totaling $972,854 were deposited and later returned because the account was closed. The total of the returned checks was $1,779,411.

¶6 On March 1, 2019, Metro gave Defendants written notice under A.R.S. § 12-671(E) that they had 12 days to make payments on all the bad checks, notwithstanding VM's earlier payment of $536,048. Defendants did not respond to the demand or make additional payments to Metro. On March 6, Metro filed suit alleging breach of contract against VM and Verdone, as well as violations of A.R.S. § 12-671 ("bad check statute") and A.R.S. § 13-2314.04 ("civil racketeering statute") against Defendants. Following Verdone's deposition, and after the court extended discovery

deadlines several times at the parties' request, Metro eventually moved for summary judgment on its three claims.

¶7        In support of its motion, Metro included the Contract, the personal guaranty, copies of the checks, a ledger summarizing each of the 59 transactions, excerpts from Verdone's depositions taken as part of this action and a separate lawsuit in court.  Metro also provided a declaration from its office manager, who oversaw the parties' accounts. Explaining the background of each transaction, the manager declared in part that "[c]onsistent with the parties' arrangement," Metro advanced the proceeds of the car to the seller, and in turn, VM "wrote a check (or authorized his agent to write a check that [Verdone] signed) to Metro for the vehicle's purchase price."

¶8        After giving credit for to VM's payments, Metro calculated its losses to be $1,243,363 for breach of the Contract and an additional $422,499.56 for unpaid auction fees and resale losses.  It also sought double damages under the bad check statute, which "entitled [it] to an award of $2,486,726."   *See* A.R.S. § 12-671(A).   And finally, under the civil racketeering statute's provision for treble damages, Metro asserted it was entitled to an award of $4,997,622.  *See* A.R.S. § 13-2314.04(D)(4).

¶9        Defendants filed a *pro per* response to the motion, summarily denying all allegations.  They obtained counsel several weeks later, and with the court's permission, filed a supplemental response arguing that the Contract was orally modified. Defendants asserted that Metro had agreed to hold checks pending Verdone's authorization to deposit them, as evidenced in part by Metro's concession that it extended credit to VM and paid the sellers of VM's cars using its funds.  As to the statutory claims, Defendants pointed to the parties' business dealings to argue such facts negated any suggestion that they intended to defraud Metro.  Defendants broadly disputed the damages claims, stating they had not been proven with reasonable certainty because a qualified accounting professional had not evaluated the calculations, and Metro incorporated unexplained losses into its calculations.

¶10        After oral argument, the superior court granted Metro's motion.  As to the violation of the bad check statute, the court found that Defendants' "proffered evidence does not defeat the statutory prima facie evidence of intent to defraud that arises from undisputed facts."  As to damages, the court held that Defendants' contention that an accounting expert was needed to prove damages with reasonable certainty was unsupported.  Defendants' motion for reconsideration was denied.

¶11 The court issued a final judgment awarding damages to Metro against Defendants for $2,486,726. Although not clearly stated in the judgment, consistent with Metro's summary judgment motion, half of the award was based on unpaid debt (the bad checks) for breach of the Contract, and the other half was the statutory doubling of damages under the bad check statute; no damages were awarded under the civil racketeering statute. The court also awarded Metro $422,499.56 on the breach of contract claim (for auction fees and resale losses) against VM and Verdone. The court then awarded Metro $75,889.65 in attorneys' fees and $4,127.58 in costs. Defendants timely appealed, and we have jurisdiction under A.R.S. § 12–2101(A)(1).

## DISCUSSION

¶12 Defendants argue the court erred in granting summary judgment for Metro on the bad check and civil racketeering claims. They do not dispute the court's judgment finding them liable for breach of contract, but they contest the corresponding damages award. Thus, the two issues we address are whether the court erred by (1) granting summary judgment on the alleged violations of the bad check statute and the civil racketeering statute, and (2) accepting Metro's damages calculation on the breach of contract claim.

¶13 Summary judgment is appropriate when no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(a). We review the court's ruling de novo, viewing the evidence and reasonable inferences in the light most favorable to the party opposing the motion. *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12 (2003). We will affirm the court's ruling if it is correct for any reason supported by the record. *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 329, ¶ 14 (App. 2014).

### A. Intent To Defraud

¶14 Defendants argue the superior court erred by concluding there were no genuine issues of material fact on whether they acted with fraudulent intent when tendering bad checks. Arizona law provides that a person who, with the intent to defraud, delivers a check knowing that he lacks sufficient funds to cover the check is liable to the holder of such check. A.R.S. § 12-671(A). "Proof that, *at the time of presentment*, the maker, issuer or drawer did not have sufficient funds with the bank or depositary, and that he failed within twelve days after receiving notice of nonpayment or

dishonor to pay the check or draft is prima facie evidence of intent to defraud." A.R.S. § 12-671(C) (emphasis added).

¶15        It is undisputed Defendants wrote or authorized 59 checks payable to Metro, and there were insufficient funds for each check. It is also undisputed Metro complied with the provisions of the bad check statute by providing notice to Defendants of their bad checks and of their obligation to remedy the non-payment within 12 days. Metro therefore established a prima facie case that Defendants intended to defraud Metro "at the time of presentment." *Id.* A prima facie showing is made where there is sufficient evidence to "establish a fact or raise a presumption unless disproved or rebutted . . . ." *Prima Facie*, Black's Law Dictionary (11th ed. 2019).

¶16        Defendants outline various reasons why there was more than enough evidence to refute or disprove the statutory presumption made against them. First, they cite this court's decision in *Morrison v. Shanwick Int'l Corp.*, 167 Ariz. 39, 44–45 (App. 1990), asserting that the presumption of fraudulent intent under § 12-671(C) can be negated by showing that the plaintiff accepted a post-dated check as an extension of credit to the defendant. *Id.* at 44. In *Morrison*, the plaintiff had loaned a sum of money to the defendant. *Id.* at 40–41. The plaintiff then accepted two post-dated checks from the defendant as its repayment. *Id.* at 41. Plaintiffs filed suit and sought statutory relief under the bad check statute after both checks were returned for insufficient funds, and they had made several demands for repayment. *Id.* at 41. In reviewing the judgment ordered against the defendant, we held that post-dated checks, which are "fully negotiable instruments upon which the demand date is fixed at some latter time," are included under the protections of § 12-671(C). *Id.* at 44–45. However, because such checks may constitute an extension of credit, accepting post-dated checks "*coupled with other factors* may overcome the presumption of intent contained in A.R.S. § 12-671(C)." *Id.* at 44–45 (emphasis added).

¶17        Here, the record shows that Metro and VM engaged in a course of dealing whereby Metro encouraged VM to buy cars through its auction on credit, and that for years Metro accepted "hold checks" and agreed to wait to deposit them until the cars were resold. Thus, Metro often extended its credit to assist VM in buying and selling many cars. Given this evidence, together with the other evidence in this record showing the various components of the parties' business relationship, Defendants have shown there are triable issues of fact on whether they rebutted the presumption of fraudulent intent.

¶18       We reject Metro's assertion that Defendants' check-holding theory fails because Verdone needed to provide verbal authorization within six months of the issue date. *See* A.R.S. § 47-4404 ("A bank is under no obligation to a customer having a checking account to pay a check, other than a certified check, which is presented more than six months after its date . . . ."). Metro does not direct us to any evidence in the record showing Verdone waited anywhere near six months to provide verbal authorization for depositing a check. For the 59 checks at issue, Metro presumably takes the position that Verdone authorized those deposits; otherwise, it would have no basis to claim that Defendants intended to defraud Metro. Moreover, under the bad check statute, the relevant time frame to consider intent to defraud is "at the time of presentment."

¶19       The superior court erred in finding no genuine issues of material fact as to whether Defendants acted with fraudulent intent under the bad check statute and civil racketeering statute. Thus, we vacate the court's grant of summary judgment against Defendants for violations of § 12-671 and § 13-2314.04.

## B.      Damages

¶20       Defendants also assert the superior court erred in awarding Metro its claimed contract damages. The plaintiff in a breach of contract action has the burden of proving "the existence of the contract, its breach and resulting damages." *Graham v. Asbury*, 112 Ariz. 184, 185 (1975). The amount of damages must be proven with reasonable certainty. *Gilmore v. Cohen*, 95 Ariz. 34, 36 (1963). In seeking summary judgment on breach of contract and breach of the personal guaranty, Metro offered copies of the dishonored checks, its accounting ledger, and a sworn declaration from their office manager stating the amount of the unpaid debt. In contrast, Defendants did not provide any financial or business records, controverting figures, affidavits, or other competent evidence to show that Metro's damages were not sufficiently proven. The court therefore concluded that Defendants' contentions were unsupported, particularly in light of Verdone's concession in a deposition that Metro was never paid as agreed and that he owed some amount of money for the dishonored checks.

¶21       Defendants argue nonetheless that Metro failed to prove its damages with sufficient certainty, particularly because the claim was not evaluated by a qualified accounting professional, was based on unmitigated losses, and incorporated two undocumented and unexplained figures. Metro, however, made a prima facie showing of the damages it incurred, and the burden then shifted to Defendants to respond with proof

of specific facts showing there was a genuine issue for trial. *See Kelly v. NationsBanc Mortg. Corp.*, 199 Ariz. 284, 287, ¶¶ 14–15 (App. 2000).

**¶22** As noted, Defendants failed to provide any specific controverting evidence. They also failed to cite legal authority to support their contention that an evaluation by a qualified accounting professional was necessary to show damages with reasonable certainty. Instead, they simply assert that Metro's accounting is unreliable, which is insufficient when contesting a summary judgment motion. *See id.* at 287, ¶ 15. ("[A] party opposing a motion for summary judgment may not rest on the pleadings; it must respond with specific facts . . . ."). The superior court did not err in granting summary judgment on Metro's damages claim for breach of contract.

### C. Attorneys' Fees and Costs

**¶23** Both parties request attorneys' fees under A.R.S. § 12-341.01, which authorizes a discretionary fee award to the prevailing party in cases arising out of contract. Defendants have not prevailed on the breach of contract claim, so we deny their request. Metro is the prevailing party on its breach of contract claim. In our discretion, we award Metro a portion of its reasonable attorneys' fees incurred on appeal subject to compliance with ARCAP 21. Metro's fee application, as well as any response from Defendants, must address what percentage of fees should be awarded, given that Metro has achieved only partial success on appeal. We decline to award taxable costs to either party.

### CONCLUSION

**¶24** We affirm the superior court's grant of summary judgment on Metro's breach of contract claim and the damages awards of $1,243,363 and $422,499.56. We vacate the court's grant of summary judgments on Metro's claims for an intent to defraud based on the bad check statute (§ 12-671) and civil racketeering (§ 13-2314.04) and the corresponding damages award. Thus, we remand for further proceedings consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED: AA